THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES A. O'NEAL, Defendant-Appellant.

Fourth District   No. 14134

Opinion filed July 25, 1977.

Frederick P. Erickson, of Armstrong, Erickson & Davis, of Decatur, for appellant.

Patrick Walsh, State's Attorney, of Decatur (Donald R. Parkinson, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

After a bench trial in the Circuit Court of Macon County defendant James A. O'Neal was convicted of rape and sentenced to imprisonment in the penitentiary for 14 to 40 years. On appeal defendant contends that (1) the trial court erred in finding the complaining witness competent to testify, (2) the evidence was insufficient to prove that the complaining witness was so mentally deficient that she could not effectively consent to sexual intercourse, (3) the evidence was insufficient to prove penetration, and (4) the sentence was excessive.

The rape was alleged to have occurred on January 23, 1976. The record shows that at the time of the alleged offense the complaining witness Lorraine Cotton was 16 years old, lived with her parents, and attended a school for the mentally retarded. Her right foot had been amputated as the result of a birth defect, and she wore a prosthesis on that leg. Her left hand was deformed and she was unable to use it to any degree at all. She also had a speech impediment.

Lorraine's sister Marie Cotton testified for the State that she and her two small children were also living with her parents on January 23, 1976. That evening Marie went to a nearby store for a few minutes leaving Lorraine at home alone with Marie's children and a 5-year-old nephew. Marie was gone for only about 10 or 15 minutes. When she returned she found the children watching television. Her nephew told her that Lorraine was in the bathroom so Marie went to look for her. The bathroom door was open and Marie saw Lorraine on her knees on the floor and defendant standing beside her with his pants unzipped. Defendant told Marie that Lorraine had asked him to help her to the bathroom. Marie had seen defendant before at a tavern but she had never seen him at her parents' house before. She asked defendant to leave and he did. She walked out to his car with him and observed the number on the license plates.

On cross-examination Marie stated that she did not hear any commotion or outcry when she returned home from the store. Defendant did not threaten her in any way. He told her he had come to the house to see her father. On redirect she stated that she had been unable to tell if Lorraine was wearing panties when she found her in the bathroom.

Rosalee Cotton, Lorraine's mother, was called as a prosecution witness and testified that she had gone to church that evening. Her husband was in the hospital then. When Mrs. Cotton arrived at the church someone met her at the door and she went back home. When she arrived home she saw Lorraine but did not observe the condition of her clothing until later after the police told her to bring it in for examination. Then she noticed that Lorraine was not wearing panties. Mrs. Cotton knew Lorraine had been wearing panties earlier that day because she had helped Lorraine dress.

On cross-examination Mrs. Cotton testified that she took Lorraine to the

hospital within an hour or so after she returned home from the church. She took Lorraine's clothing, including panties which she found in the bathroom, to the police. She did not wash any of the clothing before taking it to the police. She knew defendant; he worked with her husband and had come to their house to visit him before.

Melvin Patterson, another prosecution witness, testified that he had known defendant for many years and that on the evening of January 23, 1976, defendant had come to Patterson's house and talked to him. Mary Elizabeth Hill and Irene Boston were also present during the conversation. Defendant told them he had been caught with a girl. He did not say exactly what happened but said that "it was good and that a man didn't mind going to jail for something good." He said he thought a girl was grown at the age of 16 if she had a child. He also said he wanted to go and finish the job. Defendant repeated these statements several times. Mary Elizabeth Hill and Irene Boston also testified concerning the conversation and their testimony was substantially the same as Patterson's. Mrs. Hill, however, also recalled defendant saying that he had taken the girl to a cafe, bought her a cheeseburger, and given her $20 and that he had been caught with the girl in the bathroom.

Two police officers called by the State testified that they interviewed defendant after his arrest on the day after the alleged occurrence. After being advised of his rights, defendant told them that after leaving work on January 23, he went to a nearby tavern and then to Springfield where he spent the night with two women. He denied being at the Cotton home that evening. He told them he knew Lorraine's father but had not been to his house in quite some time. One of the officers also recalled that defendant was in his car with two women when he was arrested and had told the police "I can get the women I need because I have money. I don't need to mess around with girls or force myself on anyone."

Lorraine was also called as a witness by the State. She stated that she was 16 years old and went to Sunnyside School. In answer to questions requiring a yes or no answer, she stated that she understood that she had made a promise to tell the truth and that if she did not tell the truth she would get into trouble. She stated that she had told a lie once and had not gotten into trouble for it but that she understood that she would be in trouble if she told a lie in court. At that point the prosecutor stated that he felt the witness had been sufficiently qualified to testify. Defense counsel objected on the ground that the State had not made a sufficient showing of competency but declined an opportunity to question Lorraine. The court then found Lorraine competent to testify.

Lorraine then testified concerning the occurrence. Her answers were difficult to hear or understand. She indicated that she remembered being in the bathroom of her house with a man a few months earlier. The man

pulled her pants down and put his "thing" between her legs. Then her sister walked in. She stated that her private parts are on her "bottom" and that when the man placed his "thing" between her legs he pushed on his stomach and her stomach and his "thing" was in her "bottom."

On cross-examination Lorraine said she knew Dr. Sunderland and had talked to him but did not recall discussing the occurrence in the bathroom with him. She did not tell the doctor that the man only touched her with his "thing." She also stated that the man got off her when her sister came in and that her pants were in the bathroom. She knew "a little" about sex but didn't know where babies come from. She knew what pregnant means but didn't know how people become pregnant. She knew that sex was wrong and that if she had sex with someone she could have a baby. Her mother told her what happens when you have sex with someone. She stated that she remembered a little but not all, of what happened. She didn't know what an oath means but knew what it was to tell the truth. The prosecutor and her mother had talked to her about the occurrence. She did not know how long a minute was. She was going to school and knew how to read a little, count, and add numbers together. She knew that the President was Mr. Ford. She did not know the man in the bathroom. He had a coat on and took his pants half way off. She had never had sex with anyone before.

When Lorraine finished testifying, defense counsel moved to strike her testimony on the basis that the witness was incompetent. The motion was denied and her testimony was allowed to stand.

Dr. Dale Sunderland testified for the prosecution that he was a psychiatrist practicing in Decatur. He conducted a psychiatric evaluation of Lorraine Cotton on March 10, 1976. He gave Lorraine a "copy draw test," which indicated definite organic brain disease. He also had her do some simple arithmetic problems and found she could add on her fingers but not much beyond that. She did not know her birthday, and even after being told, she was not sure she could remember it. She knew that the President was Mr. Ford but thought that the Governor of Illinois was Mr. Lincoln. She was unable to read such words as "draw a circle," "draw a cube," or "draw a clock showing the time of 5:20." She told him she could read something in some of the books at school. He thought her mental age was approximately 5 years. Over defendant's objection, Dr. Sunderland was allowed to testify that in his opinion Lorraine probably did not know the consequences of sexual intercourse and did not have the ability to consent to it.

On cross-examination Dr. Sunderland stated that he had discussed the incident with Lorraine and that Lorraine had told him the man had touched her with his "thing" but had not put it into her. He recalled that he tried to be very careful in making sure he got this answer correctly and

made a note of the fact in his report to the State's attorney. He thought Lorraine had some awareness of the distinction. He thought that her understanding of the implications of sexual intercourse was a "gray area" which she might or might not understand.

On redirect Dr. Sunderland stated that he had not discussed with Lorraine the difference between slight and full penetration.

Dr. Joseph Stroyls, a gynecologist who examined Lorraine approximately two hours after the incident, was called as a defense witness. He stated that he found that Lorraine's hymenal ring was not intact but was well-healed, a finding consistent with prior intercourse, masturbation with an object, or multiple examinations with a speculum. There was no evidence of trauma. He tested Lorraine's vagina for sperm and seminal fluid and both tests were negative.

On cross-examination Dr. Stroyls testified that all that the tests showed was that there had been no ejaculation, not that there had been no penetration. There could be full penetration without trauma if there had been previous intercourse or other disruption of the hymenal ring. Dr. Stroyls also stated that he had treated a number of mentally retarded children and a majority of the girls had had disrupted hymenal rings. On redirect Dr. Stroyls stated that the washing of the genitalia would not have any effect on detecting sperm in the vagina.

The State and defendant stipulated that if James E. Bald, a criminologist, were called as a witness he would testify that he examined Lorraine's clothes and found no seminal material on them. Although the State objected to admission of the stipulation on the ground that it was merely negative evidence, the stipulation was admitted.

Defendant testified that he finished work at about 2 or 2:30 on Friday, January 23, 1976. After work he went to a tavern and had a beer or two and then to the Cottons' house to see Mr. Cotton because he had heard he was sick. He worked with Mr. Cotton and had known him for over 10 years. When he got there Marie Cotton was there and he talked to her. He didn't know who let him into the house. After a while he went into the bathroom and Lorraine came in behind him. The door was open. He did not use the bathroom. He said "excuse me" and then Marie came in and asked him to leave. She walked to the car with him and he left. He was wearing a pair of blue jeans with a pair of khaki pants over them. The zipper was broken on the khaki pants and he had to pin them up. He wore them back and forth to work. He did not take any of his clothes off; he did not take Lorraine's pants off. He did not have sexual relations with her but he did put his hand under her dress. He did not know whether Lorraine was wearing panties or not. He did not put his fingers into her.

After defendant left the Cottons' house he went to a tavern and then to

Pat (Melvin) Patterson's house. He had known Patterson for about 7 years; they drank beer together and talked about women. That night he and Patterson were "jivin' " and "jokin'."

When defendant was arrested the next day he did not tell the police he had been to the Cottons' house because he did not want to say too much until he had a lawyer.

On cross-examination defendant admitted that he might have told the police that he went directly to Springfield on the night of the occurrence but if he did he was "just jiving along with the police" because he did not want to say anything when he did not have a lawyer there. It was true he went to Springfield that night, but he had gone to the Cotton home first. He had had a half pint of gin, a quarter pint of vodka, a hotdog, and a beer at the tavern before going to the Cottons' house. When he went into the bathroom Lorraine may have already been in there. Her dress was down and she was crawling around. She looked just like anyone else to him. He knew she was missing a leg and was retarded, but did not notice anything wrong with her left arm. Touching her under her dress was not a prelude to sexual activity; he did it "just to be doing something." He didn't remember taking her panties off. He was positive that he could not have had intercourse with her. He did not know she was 16, he just assumed she was. He did not think Lorraine was an available sexual partner for him. He was just joking when he told Irene Boston, Mary Hill, and Melvin Patterson that he had had a 16-year-old girl and had been interrupted.

■■ We first consider defendant's contention that Lorraine Cotton was so severely retarded as to be incompetent to testify and that the trial court erred in permitting her to testify. No separate hearing was held to consider Lorraine's competency. However, at the bench trial, she was asked questions relevant to competency and the court made a ruling on her competency before she was allowed to testify concerning the occurrence. In response to questions by the prosecutor, she stated her name, age, and school. She also indicated that she understood what it means to tell the truth and that she would get into trouble if she did not tell the truth. Defense counsel was offered an opportunity to cross-examine her prior to the court's ruling on her competency, but he declined. Her answers to these questions and her later testimony concerning the occurrence indicated that she had at least some "capacity to observe, recollect and communicate" (*People v. Cox* (1967), 87 Ill. App. 2d 243, 246, 230 N.E.2d 900, 902). As this court indicated in *People v. Brooks* (1976), 39 Ill. App. 3d 983, 350 N.E.2d 821, a feebleminded person may be competent as a witness if he possesses the capabilities set forth in *Cox*. The finder of fact, here the court itself, was clearly apprised both by Lorraine's testimony and that of the psychiatrist that she was severely

retarded, so that it could consider this factor in deciding how much weight to give to her testimony. No error occurred in allowing Lorraine to testify.

■■ On the other hand, defendant also contends that the evidence was insufficient to prove that Lorraine Cotton was so severely retarded that she could not effectively consent to sexual intercourse. Section 11—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 11—1) defines rape to include "intercourse * * * [w]here the female is so mentally deranged or deficient that she cannot give effective consent to intercourse." Apparently the only case to deal with the question of what degree of mental deficiency is required before effective consent will be deemed to be lacking is this court's decision in *People v. Blunt* (1965), 65 Ill. App. 2d 268, 212 N.E.2d 719. There, in ruling that the complaining witness was not so mentally deficient that she could not effectively consent to intercourse, the court stated:

> "In other jurisdictions where punishment is imposed upon those having sexual intercourse with females who through unsoundness of mind are incapable of effective consent, the capacity to consent 'presupposes an intelligence capable of understanding the act, its nature and possible consequences.' [Citation.]" 65 Ill. App. 2d 268, 274, 212 N.E.2d 719, 722.

In *Blunt* the complaining witness (Joy) had an I.Q. of about 77 or 78, had completed high school in special education classes, and was able to travel alone by bus to another town, cook meals, clean house, shop, attend movies, and babysit. The alleged rape took place in a motel after a date. Joy's mother had explained the facts of life to her and testified that Joy felt ashamed about the episode.

A very different picture is presented in the instant case. Here the psychiatrist testified that Lorraine had a mental age of about 5 years, and Lorraine's own testimony indicated very little ability to perform any but the most simple mental tasks. Although the psychiatrist stated that he thought Lorraine's knowledge of the implications of sexual intercourse was a "gray area," Lorraine certainly did not demonstrate much understanding of the subject in court. We therefore conclude that there was ample evidence that Lorraine was so retarded as to require protection under the mental deficiency provision of the rape statute.

■■ Another contention made by defendant is that the evidence was insufficient to prove penetration, an essential element of the offense of rape, and that therefore his conviction should be reversed or at least reduced to attempt rape. At trial Lorraine testified that defendant put his "thing" between her legs and pushed and that his "thing" was in her "bottom." This was the only evidence of penetration presented. The psychiatrist testified that in his interview with Lorraine prior to trial he

asked her questions about penetration and concluded from her answers that she was saying that there had been no penetration. The tests for seminal fluid and sperm were all negative. Lorraine's sister Marie did not see any act of intercourse. The witnesses who testified to a conversation with defendant later in the evening indicated that he had said that he had had a 16-year-old girl but had been caught and had not been able to finish the job. He did not indicate to them how far he had progressed before being interrupted.

■■ While we conclude that the evidence was not sufficient to prove penetration beyond a reasonable doubt and therefore defendant was not proved guilty of rape beyond a reasonable doubt, we also conclude that there was sufficient evidence to prove defendant guilty of attempt rape beyond a reasonable doubt. Defendant admitted being in the bathroom with Lorraine and touching her under her dress. The testimony concerning his conversation with friends later in the evening indicated that he had at least been attempting to have intercourse with the girl when he was interrupted. Lorraine's sister Marie testified that when she found defendant in the bathroom with Lorraine, Lorraine was on the floor and defendant had his pants unzipped. Lorraine's testimony, even if unclear on the penetration question, clearly indicated that defendant at least touched her with his penis.

It is within this court's power under Supreme Court Rule 615(b)(3) to reduce the degree of an offense to a lesser included offense. (*People v. Trinkle* (1976), 40 Ill. App. 3d 730, 353 N.E.2d 18, *appeal allowed* (1976), 64 Ill. 2d 598.) In *People v. Oliver* (1976), 38 Ill. App. 3d 166, 347 N.E.2d 865, a conviction was reduced from deviate sexual assault to attempt deviate sexual assault where the complaining witness was unknowledgeable about terminology and it was unclear from her testimony whether there was anal touching or only touching of the buttocks. Under the similar circumstances of the instant case we reduce defendant's conviction from rape to attempt rape. Because the cause is to be remanded to the trial court for resentencing on the reduced charge of attempt rape, we need not consider defendant's contention that the sentence imposed for rape was excessive.

For the reasons stated above, the judgment of conviction of rape is reduced to a judgment of conviction of attempt rape and the sentence imposed on the rape charge is vacated. The cause is remanded to the trial court with directions to resentence the defendant on the modified judgment of conviction of attempt rape.

Judgment of conviction affirmed as modified, sentence vacated, and cause remanded with directions.

REARDON and KUNCE, JJ., concur.