(777 P.2d 278)

No. 62,855

ROY A. KEIM, *Appellant*, v. STATE OF KANSAS, *Appellee.*

Opinion filed July 21, 1989.

*Thomas Jacquinot*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*Ty Kaufman*, county attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before ABBOTT, C.J., BRAZIL and LEWIS, JJ.

ABBOTT, C.J.: Roy A. Keim appeals from the trial court's denial of his K.S.A. 60-1507 motion, in which he alleged K.S.A. 21-3502(1)(c) is unconstitutionally vague.

On June 14, 1987, Keim attempted to have sexual intercourse with D.C., a thirty-year-old woman with Down's Syndrome. Psychological testing indicates D.C. has a functional age of between four and six years. D.C. and her roommate, J.G., also a mentally retarded adult, lived semi-independently in an apartment in McPherson.

In a statement to her "Independent Living Coordinator" after the incident, D.C. reported that Keim came to the women's apartment at approximately 9 p.m. D.C. recognized Keim as a man who had "scared" her in the laundromat on two separate occasions. D.C. reported she repeatedly asked Keim to leave and, when he would not do so, she and J.G. became frightened and went into their bedroom. Keim followed the women into

their bedroom, took off his clothes, got on the bed with D.C., and then took off her clothes. D.C. reported that Keim pulled her hair, squeezed her shoulder and her leg, bit her breast, and hurt her in the vaginal area.

After D.C. reported the incident, Keim voluntarily went with police investigators and gave a statement. Keim reported he had met D.C. and her roommate at the Tidy Laundry in McPherson and admitted he knew they were mentally retarded. Keim told the police that, on the afternoon of June 14, he and D.C. arranged to watch TV at her apartment that evening. Keim reported he had watched TV for about fifteen minutes before noticing D.C. touching her roommate's leg. Keim got down on the floor with the women and began to rub their backs and play around. Keim stated he asked the women if they would go to the bedroom, and they did.

According to Keim, once in the bedroom, Keim took off his clothes. Keim continued to rub D.C.'s back, and she took off her shirt. This frightened D.C.'s roommate, who first put a blanket over her head and then left the room. Keim removed D.C.'s panties and reported she "was letting him do anything he wanted to her." When Keim attempted to penetrate D.C.'s vagina, she appeared to feel pain and said, "No, no, no." At that point, it occurred to Keim that D.C. might be a virgin, so he stopped, got dressed, and left.

K.S.A. 21-3502 provides:

"(1)  Rape is sexual intercourse with a person who does not consent to the sexual intercourse, under any of the following circumstances:

. . . .

"(c)  when the victim is incapable of giving consent because of mental deficiency or disease, which condition was known by the offender or was reasonably apparent to the offender."

Keim contends the words "incapable of giving consent because of mental deficiency or disease" are unconstitutionally vague; consequently, K.S.A. 21-3502(1)(c) violates due process of law as guaranteed by the United States Constitution. An appellate court's review of the constitutionality of a statute is well established:

"This court adheres to the proposition that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if

possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done." *State v. Huffman*, 228 Kan. 186, Syl. ¶ 1, 612 P.2d 630 (1980).

The test to determine whether a criminal statute is unconstitutionally vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. A statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process.

Keim argues that, under K.S.A. 21-3502(1)(c), a known or apparent mental defect must cause an inability to give consent. Because a nonprofessional cannot judge when a mental defect or deficiency creates a situation where consent is not possible, there is no clear standard by which a defendant can determine whether an individual with a mental handicap has capacity to consent. Keim argues that, although a defendant may "sense potential danger," there is not a clear line between criminality and noncriminality.

The Kansas Supreme Court has previously addressed the constitutionality of the rape statute. In *State v. Cantrell*, 234 Kan. 426, 434-35, 673 P.2d 1147 (1983), *cert. denied* 469 U.S. 817 (1984), the defendant challenged the constitutionality of K.S.A. 21-3502(1)(a), arguing that men of ordinary intelligence might well differ as to the meaning and application of "when a woman's resistance is overcome by force or fear." Thus, an argument similar to the argument in this case was made concerning an offender's ability to judge a victim's "resistance," "force," and "fear." Without discussion the Supreme Court held, "The statute is clear, readily understandable by persons of common intelligence and as such was constitutional." 234 Kan. at 435.

In *State v. Lile*, 237 Kan. 210, 699 P.2d 456 (1985), the defendant argued that the rape statute focuses on the victim's intent, and "it is not always possible to determine a potential sex partner's state of mind and, therefore, the statute as presently construed fails to give a person of ordinary intelligence fair notice his contemplated conduct is forbidden by statute." 237 Kan. at 212. Again, without discussion, the Supreme Court held the rape statute constitutional. Although the constitutionality of

subsection (c) of the rape statute has not been addressed in a published opinion in a Kansas appellate court, similar sections have been addressed by courts of other states.

Iowa Code § 709.4(2) (1987) prohibited sexual intercourse when the "other participant is suffering from a mental defect or incapacity which precludes giving consent." In *State v. Sullivan*, 298 N.W.2d 267 (Iowa 1980), the Iowa Supreme Court upheld the constitutionality of that part of the statute, reasoning:

"We are unimpressed by defendant's arguments that the statute is rendered vague by its requirement that the alleged violator determine another's mental capacity. The potential offender must simply determine if his or her partner understands the nature and consequences of engaging in the sex act. Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse. The potential offender who would engage in sex acts with a stranger may be required to ask questions to be 'safe,' just as he or she would be required to do in order to ascertain the other's chronological age to avoid prosecution under subsection 709.4(3).

"The fact an erroneous judgment by an offender may still subject him or her to criminal sanction if the partner in *fact* does not possess the requisite mental capacity does not make the statute unconstitutional. This crime does not require knowledge or intent. As in the case of sexual abuse due to age status, the policies in support of protecting those who suffer mental incapacities outweigh the danger of mistake." 298 N.W.2d at 272-73.

In *State v. Degrenier*, 120 N.H. 919, 424 A.2d 412 (1980), the defendant challenged the constitutionality of a rape statute which makes it a felony for a person to engage in sexual penetration with another person not his spouse when "the victim is mentally defective and the actor knows or has reason to know that the victim is mentally defective." N.H. Rev. Stat. Ann. § 632-A:2 VIII (1986). Like our statute, the New Hampshire law requires that a defendant have knowledge that the victim cannot give legal consent.

The Supreme Court of New Hampshire construed the statute to prohibit intercourse only with those persons whose mental deficiency renders them incapable of legally consenting to the act. The court held that, although the degree of mental defectiveness of the victim necessary to violate the statute may not be entirely clear, the statute is sufficient "to give the defendant fair warning that, by engaging in sexual intercourse with one who he knows or has reason to know is mentally defective in any recognizable and appreciable degree, he is violating the statute.

Mathematical precision in the drafting of penal statutes is not required." 120 N.H. at 921.

The reasoning in the above case is applicable to this case. The language of K.S.A. 21-3502(1)(c) sufficiently warns a person of common intelligence that engaging in sexual intercourse with one who is mentally handicapped to a degree that he or she cannot understand the nature and consequences of engaging in the act is prohibited. Under normal circumstances a mental incapacity to consent would be apparent in ordinary social intercourse. The fact that further questioning may be necessary in some cases to determine if one's partner fully understands the nature and consequences of sexual intercourse, does not render the statute unconstitutional. We conclude K.S.A. 21-3502(1)(c) is not unconstitutionally vague.

Keim argues in both his motion and his brief that he could not reasonably have known D.C. could not give consent. In his motion, he notes that English is not his first language and he has only a fifth grade education. He argues in his brief that, although D.C.'s mental handicap was evident, the extent of the handicap was not since she appeared to be living independently. Keim notes that D.C. was capable of giving "nonconsent," as demonstrated by the fact that sexual intercourse did not take place. It appears, however, that D.C.'s saying "No" could have been due to pain and not to her ability to consent or not consent. Keim argues he was unable to determine that she was incapable of giving her consent because of her mental deficiency.

D.C. has Mongoloid features, a speech impediment, and could only communicate on the most elementary level. Even if we thought questions of fact arguably existed, including whether D.C. was incapable of giving consent, and, if so, whether Keim could reasonably have known, it would be of no comfort to Keim. He entered a plea of nolo contendere to the charge against him and may not now argue that there was not substantial competent evidence to support the lack of consent necessary to sustain his conviction.

Affirmed.