589 A.2d 597
STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
FREDDIE ALLAN RIOS OLIVIO,
DEFENDANT–RESPONDENT.

Argued November 26, 1990—Decided May 1, 1991.

*Steven E. Braun,* Senior Assistant Prosecutor, argued the cause for appellant (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

*Daniel V. Gautieri,* Assistant Deputy Public Defender, argued the cause for respondent (*Wilfredo Caraballo,* Public Defender, attorney; *Daniel V. Gautieri* and *Nicholas Celso, III,* Designated Counsel, on the briefs).

*Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

*Elizabeth Miller–Hall,* Assistant Prosecutor, submitted a brief on behalf of *amicus curiae* Essex County Prosecutor's Office (*Herbert H. Tate, Jr.,* Prosecutor, attorney).

*Steven J. Kaflowitz,* Special Deputy Attorney General and Acting Assistant Prosecutor, submitted a letter in lieu of brief on behalf of *amicus curiae* County Prosecutors Association of New Jersey (*Edmund J. Tucker,* Special Deputy Attorney General In Charge and Acting Union County Prosecutor, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case, defendant, Freddie Olivio, was convicted of a sexual assault on a mentally-defective person. Defendant admits having had intercourse with the victim, but denies that she is, in fact, mentally defective under the criminal statute. The Court is thus required to determine when a person who engages in such sexual conduct is mentally defective under the criminal code. The difficulty in making that determination inheres in its implications for both mentally-defective persons who are vulnerable and need the special protections of our laws from the sexual intrusions of others and persons whose mental deficiencies need not be an impediment to the enjoyment of a reasonably normal life, including consensual sexual relations.

The sexual encounter between defendant and the victim, M.R., gave rise to charges for kidnapping, *N.J.S.A.* 2C:13–1(b)(1), aggravated sexual assault, *N.J.S.A.* 2C:14–2a(4), sexual assault with physical force, *N.J.S.A.* 2C:14–2c(1), and sexual assault on a mentally-defective person, *N.J.S.A.* 2C:14–2c(2). The jury found defendant not guilty on the first three charges and guilty on the fourth. The court sentenced defendant to a five-year term of imprisonment and imposed a $30 VCCB penalty. The Appellate Division reversed defendant's conviction. *State v. Olivio,* 237 *N.J.Super.* 428, 568 *A.*2d 111 (1989). The court held that the State had not proved that the victim was mentally defective, and that there was no evidence that defendant knew or should have known that the victim was mentally defective. This Court granted the State's petition for certification. 122 *N.J.* 123, 584 *A.*2d 200 (1990).

We now hold that a person is mentally defective within the meaning of *N.J.S.A.* 2C:14–2c(2) if, at the time of the sexual activity, he or she is unable to comprehend the distinctively sexual nature of the conduct or is incapable of understanding or exercising the right to refuse to engage in such conduct with another. Further, we find that there was sufficient evidence adduced in the trial of this case to satisfy this test, as well as the statutory requirement ascribing to the defendant knowledge of the mental condition of the victim. Accordingly, we modify the judgment of the Appellate Division and remand the matter for a new trial.

I.

That the victim, M.R., and defendant engaged in sexual intercourse on February 12, 1985, is not disputed. M.R. was sixteen years old at the time of the episode. M.R. testified that defendant drove her to a hotel, threateningly displayed a knife, and then had sexual intercourse several times with her. The jury, however, acquitted defendant of kidnapping, aggravated sexual assault, and sexual assault by force, implying that it

found that the sexual activity was voluntary. Defendant presented a different version of the episode. He testified that he met M.R. in the entrance of his building, where she had come looking for a friend of hers, that M.R. asked for a ride, and that they had voluntary sexual intercourse in the car. After the sexual encounter, they drove to a bar, where defendant went in to buy beer and cigarettes while M.R. waited in the car. A police officer approached the car, having been alerted to the description of a missing sixteen-year-old female, and asked her if she was "okay." She replied that she was waiting for a friend. When defendant arrived, the officer took them both to headquarters. The following day, M.R. told her aunt that a man had put her in a car and raped her. The aunt told M.R.'s mother and suggested they contact the police. Defendant was arrested, and gave the police conflicting statements, first denying and later admitting that he had had sex with M.R.

Considerable testimony and evidence was presented at trial with respect to M.R.'s mental capacity. She was classified as "educable mentally retarded" and was enrolled in a special education class at Passaic High School. According to her mother, M.R. "forgets everything" and can perform only basic household chores such as sweeping and washing dishes. Her aunt described her as "slow." The slowness and simplicity of M.R.'s testimony also demonstrate that M.R.'s intellectual capacity is conspicuously limited.

Both sides presented expert testimony. Ms. Charlotte Leitner, a clinical psychologist and a witness for the prosecution, examined M.R. in September 1986. She concluded that M.R.'s full scale I.Q., based on the Wechsler Adult Intelligence Scale, is 65. The range under 69 is considered "mentally defective," according to the Wechsler Scale and the Diagnostic Statistical Manual. On that basis, M.R. ranks approximately in the bottom two percent of the American adult population. According to Ms. Leitner, "[s]he seemed very naive and socially inept. She didn't seem to do very much without supervision; seemed

rather passive; never worked; never baby sat." Ms. Leitner observed that M.R. was more responsive during the interview when she discussed her favorite television programs, a series of Spanish-language love stories. When asked whether in her opinion M.R. was unable to understand the nature of her conduct, Ms. Leitner responded, "I believe she's mentally defective and unable to understand the ripple effects or the consequences of her behavior."

Richard Garcia, a school psychologist, testified for the State. He examined M.R. for the Passaic Public Schools in February 1984, when she was fifteen years old. Mr. Garcia concluded that her I.Q. was approximately 40 to 50, using the Wechsler Intelligence Scale for Children Revised, and that she was "educable mentally retarded." He reported his observations of her: "Very dependent youngster; shy; withdrawn. She wanted her mother there; child-like; young 15 year old." According to Mr. Garcia, M.R. functioned socially at about the level of a seven- or eight-year-old.

Dr. Rene Rocha, a clinical psychologist, testified for the defense. He examined M.R. in February 1986. Using the Escala de Inteligencia Wechsler para Adultos, a Spanish-language intelligence test standardized to the population of Puerto Rico, where M.R. grew up, Dr. Rocha concluded that her full scale I.Q. was 86. That placed her in the Dull Normal Range of intelligence, at about the fourteenth percentile among those of her age and cultural background. He noted that one of her strengths was "the ability to adequately perceive and understand the requirements of social situations." Regarding the disparity between the results of his tests and the results of the other psychologists' tests, Dr. Rocha suggested that the highest score is the most reliable.

## II.

The Code of Criminal Justice, *N.J.S.A.* 2C:14–2c(2), criminalizes the sexual penetration of a person who is "mentally defective." Such an act is deemed to be a sexual assault:

> An actor is guilty of sexual assault if he commits an act of sexual penetration with another person under ... the following circumstances:
>
> (2) The victim is one whom [sic] the actor knew or should have known was physically helpless, mentally defective or mentally incapacitated. [*Ibid.*]

The Criminal Code defines "mentally defective" as follows:

> "Mentally defective" means that condition in which a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of understanding the nature of his conduct, including, but not limited to, being incapable of providing consent. [*N.J.S.A.* 2C:14–1h.]

The critical issue is determining the meaning of the statutory concept of "mentally defective." The statutory language is hardly self-defining. We must therefore construe the statute in light of its underlying purpose and intent. *State v. Madden,* 61 *N.J.* 377, 389, 294 *A.*2d 609 (1972). The legislative history and the evolution of the statutory provision to its present form provide important telltales of the Legislature's objectives. They demonstrate the Legislature's abiding concern that the scope of mental defectiveness be narrow enough not to impinge on consensual sexual activity involving only mildly-retarded persons.

The statute originally defined "mentally defective" as a condition that rendered one incapable of "appraising" the nature of his or her conduct. *L.*1978, *c.* 95. See 3 *Wharton's Criminal Law* § 289 (14th ed. 1980) ("§ 289.—Incapacity to consent.... A female is also incapable of consenting to sexual intercourse when she is 'mentally defective', i.e., when she is suffering from a 'mental disease or defect' which renders her 'incapable of appraising' the nature of her conduct...."). There was concern, however, that mental capacity defined in terms of the ability to "appraise" conduct could be construed too broadly. The New Jersey Criminal Law Revision Commission, which formulated the New Jersey Code of Criminal Justice, addressing that concern observed:

> The difficult problem is to define the degree of mental deficiency or impairment which shall bring the statute into play. The Code limits criminality to situations of known mental disease or defect so serious as to render the woman "incapable of appraising the nature of her own conduct." Conditions affecting only the woman's capacity to "control" herself sexually will not involve criminal liability.

Also, by specifying that the woman must lack capacity to appraise "the nature" of her conduct, we make it clear that we are not talking about appraisals involving value judgments or consideration of remote consequences of the immediate acts. The typical case that remains within the revised clause would be the case of intercourse with a woman known to the defendant to be manifestly and seriously deranged. [*Commentary to the New Jersey Penal Code, Final Report of the New Jersey Criminal Law Revision Commission* 194–95 (1971) (hereafter *Final Report*).]

The Legislature, in 1983, amended the definition to narrow the scope of mental defectiveness by replacing the word "appraising" with "understanding." *L.*1983, *c.* 249, § 1. The Senate Judiciary Committee statement regarding that change explained that the purpose of the amendment was to restrict its applications to avoid criminally penalizing persons sexually involved with adults who were only mildly retarded:

In reviewing Assembly Bill No. 1844, it was suggested that its enactment as drafted might result in the criminalization of consensual sexual acts by even mildly retarded adults. In order to minimize this possibility, the committee adopted amendments to the definitions of the terms "mentally defective" and "mentally incapacitated" as used in chapter 14 so that only those incapable of understanding the nature of their conduct would be unable to consent to sexual activities. [Statement of the Senate Judiciary Committee, Assembly Bill No. 1844—*L.*1983, *c.* 249 (hereafter Statement of the Senate Judiciary Committee).]

The significance of the alteration was the subject of additional commentary:

This definition was changed slightly by L.1983, c. 249. The concern was that without this change the addition to 2C:14–2c(2) of a provision criminalizing sexual contact with mentally defective persons, made by the same statute, might have been construed to include even mildly retarded persons and therefore criminalize consensual sexual activity involving such persons. Senate Committee Statement to A–1844 (1983). The definition now makes it clear that persons are mentally defective within the meaning of this chapter only if incapable of *understanding* the nature of their conduct, i.e. that they are engaged in sexual activity and that others may not engage in sexual activity with them without their consent. Previously they were included if unable to *appraise* that conduct, i.e. as being either morally right or wrong. [Cannel, *Criminal Code Annotated* (1991 ed.), comment on N.J.S. 2C:14–1h (citation omitted).]

Clearly, then, the authors of the Code struggled to focus on levels of mental functioning that would avoid criminalizing consensual sexual conduct on the part of persons not genuinely in need of the laws' special protections. The Law Revision

Commission emphasized that consensual sexual activity should not generally be criminal. For example, in the context of decriminalizing consensual sodomy, the Commission observed: "Our proposal to exclude from the criminal law all sexual practices not involving force, adult corruption of minors, or public offense is based on the grounds that no harm to the secular interests of the community is involved in a typical sex practice in private between consenting adult partners." *Final Report, supra,* at 196. Consistent with that general philosophy, the Commission had earlier observed with respect to persons alleged to be "mentally defective" that "[c]onditions affecting only the woman's capacity to 'control' herself sexually will not involve criminal liability." *Final Report, supra,* at 195.

The evolution of the statutory provision indicates that the legislative concept of "mentally defective" for the purposes of the sexual assault statute consists of two intertwined strands, one relating to the ability to consent to sexual conduct, the other relating to the ability to know or understand that conduct is sexual. A 1989 amendment to *N.J.S.A.* 2C:14–1h explicitly included the inability to consent in the definition of mentally defective, by adding the underlined words as follows: " 'Mentally defective' means that condition in which a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of understanding the nature of his conduct, *including, but not limited to, being incapable of providing consent." L.*1989, *c.* 228, § 2 (effective December 29, 1989). The parties agree that the revision merely clarified the statute rather than changed it, stating explicitly that which was already implied under the predecessor statute.

The Appellate Division in this case ruled that the determination of "mentally defective" in the context of the sexual-assault statute

> involves an inquiry into whether or not the complainant could appreciate the inviolability of her person and that others could not, without her consent, invade her person for carnal gratification. [237 *N.J.Super.* at 430–31, 568 *A.*2d 111.]

The appellate court construed the Code language "capacity to understand the nature of [the] conduct" to implicate only or primarily a person's sense of personal privacy and an awareness of the right to be free from the sexual attentions or invasions of others.

The standard articulated by the court below does not mention intellectual comprehension or knowledge of sex as an aspect of the capacity to understand the nature of the conduct. However, knowledge that conduct is sexual surely is implicit in the court's focus on the ability to consent to sexual conduct. Knowledge or appreciation of the right to withhold consent to the sexual intrusions of others imports some basic understanding or awareness that the intrusive conduct is distinctively sexual in nature. As observed by one commentator, the Appellate Division's holding interpreting the statutory amendments "makes it clear that persons are mentally defective within the meaning of this chapter only if incapable of *understanding* the nature of their conduct, i.e. that they are engaged in sexual activity and that others may not engage in sexual activity with them without their consent." Cannel, *supra*, comment on N.J.S. 2C:14–1h.

The difficult and critical interpretive challenge is how much or how little knowledge of sex should be ascribed to a person in order for that person to be considered "mentally defective" under the statute. The attempts of other jurisdictions to resolve this dilemma are instructive. A number of states have construed statutes analogous to *N.J.S.A.* 2C:14–2c(2). See Annotation, "Rape or Similar Offense Based on Intercourse with Woman Who is Allegedly Mentally Deficient," 31 *A.L.R.*3d 1227 (1970); 65 *Am.Jur.2d Rape*, § 9 at 766–67 (1972); 3 *Wharton's Criminal Law, supra*, § 289 n. 92 (citing analogous statutes and cases interpreting them). Some have given such statutes broad, expansive interpretations. A few cases would require a determination of whether the victim could understand the moral and societal aspects or implications of sex. *See, e.g., Brooks v. State*, 555 *So.*2d 1134, 1136–37 (Ala.Crim.App.1989); *People v.*

*Gross,* 670 *P.*2d 799, 801 (Colo.1983); *State v. Gonsalves,* 5 *Haw.App.* 659, 706 *P.*2d 1333, 1337 (1985); *People v. McMullen,* 91 *Ill.App.*3d 184, 46 *Ill.Dec.* 492, 495, 414 *N.E.*2d 214, 217 (1980). In *People v. Easley,* 42 *N.Y.*2d 50, 396 *N.Y.S.*2d 635, 364 *N.E.*2d 1328 (1977), the New York Court of Appeals interpreted a statute that deems someone "mentally defective" if he "suffers from a mental disease or defect which renders him incapable of appraising the nature of his conduct." The court held that appraisal of conduct involves not merely understanding the physiological elements of sex, but includes understanding "the moral quality" of the conduct "in the framework of the societal environment and taboos to which a person will be exposed." *Id.* at 56, 396 *N.Y.S.*2d at 639, 364 *N.E.*2d at 1332.

The expansive view of mentally defective has been criticized. In *State v. Sullivan,* 298 *N.W.*2d 267 (1980), the Supreme Court of Iowa struck down as unconstitutionally vague the part of Iowa's analogous statute that read "or lacks the mental capacity to know the right and wrong of conduct in sexual matters." *Id.* at 272. The court explained: "The problem is that no matter how carefully circumscribed in a jury instruction, the challenged provision inevitably will result in convictions based not on the jury's view of the facts, but on its view of the morality of certain sexual conduct." *Id.* at 271. The Attorney General echoes this concern: "The Attorney General, while he agrees [with *Easley* ] that understanding the nature of one's conduct encompasses more than the knowledge of the physical act, is reluctant to use the ability to understand the morality of an act as an element of consent. Such a concept seriously muddies the water and does not help formulate a workable definition or standard."

Moreover, this expansive view, which is arguably overly protective of mentally-handicapped persons, appears never to have been one the Legislature envisaged. Even though the original proposal under the Code had the broader term "appraising," as opposed to "understanding," it was still believed that "by specifying that the woman must lack capacity to

appraise 'the nature' of her conduct, we make it clear that we are not talking about appraisals involving value judgments or consideration of remote consequences of the immediate acts." *Final Report, supra,* at 195. Further, by replacing the term "appraising" with "understanding" in 1983, the Legislature made clear that the inability to appreciate that sexual conduct. was "either morally right or wrong" was not part of the test of mentally defective. Cannel, *supra,* comment on N.J.S. 2C:14–1h.

Other states, while eschewing such expansive applications of the statutory concept of mentally defective, nevertheless construe the incapability of understanding as relating to the "consequences" as well as the "nature" of sex. *See, e.g., State v. Johnson,* 155 *Ariz.* 23, 745 *P.*2d 81, 84 (1987); *People v. Washington,* 167 *Ill.App.*3d 73, 117 *Ill.Dec.* 809, 811, 520 *N.E.*2d 1160, 1162, *appeal denied,* 121 *Ill.*2d 584, 122 *Ill.Dec.* 445, 526 *N.E.*2d 838 (1988); *People v. O'Neal,* 50 *Ill.App.*3d 900, 8 *Ill.Dec.* 871, 875–76, 365 *N.E.*2d 1333, 1337–38 (1977); *Stafford v. State,* 455 *N.E.*2d 402, 406 (Ind.Ct.App.1983); *State v. Chancy,* 391 *N.W.*2d 231, 235 (Iowa 1986); *State v. Sullivan, supra,* 298 *N.W.*2d at 273; *Keim v. State,* 13 *Kan.App.*2d 604, 777 *P.*2d 278, 280 (1989); *State v. McDowell,* 427 *So.*2d 1346, 1350 (La.Ct.App.1983). The "nature and consequences" test opens a wide array of possible interpretations. In order for a person not to be considered "mentally defective," that test could require that the person specifically understand that sex can lead to pregnancy and sexually-transmitted disease. Or, that test might mean that the person have only a general awareness that sex can involve serious consequences, requiring, at a minimum, that for a person not to be considered mentally defective, something more than an understanding of the physiological aspect of sex must be shown.

Knowledge that conduct is sexual, according to the State, would include awareness of immediate serious consequences, such as pregnancy or disease. The State infers that such a lack of understanding can result from developmental immaturity

attributable to mental deficiencies. The State derives some support for its view of consent as incorporating such knowledge from an analogy to statutory rape, suggesting that the developmentally young can be equated with the chronologically young. It points out that the legislative rationale in providing "for statutory rape when females below a certain age engage in sexual relations ... is that those below that age do not possess the maturity to consent to sexual relations." Hence, the State reasons, "[a] retarded person such as M.R., who possesses the social maturity of a seven or eight year old, is also vulnerable and *incapable of consenting to sexual relations.*" It argues that a mentally-defective person whose developmental maturity is not greater than those protected by the statutory-rape provisions is entitled to similar consideration. "Since [M.R.] was proven to possess the maturity of a seven or eight year old," the State insists, "she and those like her similarly are within a class of people requiring protection. [M.R.] could not have possibly provided a mature consent."

Defendant, on the other hand, contends that all of the foregoing approaches are too protective of mentally-impaired persons and are unfair to them, as well as to their partners. The statutory definition of "mentally defective," according to defendant, should not include the intellectual capacity to know that sexual conduct entails serious consequences, or even knowledge that conduct is distinctively sexual in nature, but rather should focus exclusively on the volitional or consensual capacity of the victim to refuse sexual acts. Such a narrow definition, he contends, comports with the 1983 amendment to *N.J.S.A.* 2C:14–1h, which substituted the word "understanding" for "appraising," and was designed to prevent criminalizing consensual sexual activity between mildly retarded individuals. *See* Statement of the Senate Judiciary Committee, *supra.*

Hence, defendant characterizes the State's position in this case as overly-paternalistic and unfair to mentally-disadvantaged persons in that it assumes, in the face of countervailing evidence, that the mentally retarded are unable to control their

sex drives or unable to cope adequately with pregnancy and parenting. See, *e.g.*, Hayman, "Presumptions of Justice: Law, Politics, and the Mentally Retarded Parent," 103 *Harv.L.Rev.* 1202, 1246 (1990) ("the mentally retarded person—no more and no less a sexual being than his non-labeled counterpart—is largely deprived of legitimated sexual expression by social and legal attitudes" (footnotes omitted)).

This Court has expressed its concern about unenlightened attitudes toward mental impairment and about the importance of according the mentally handicapped their fundamental rights. "After a history of isolation and neglect, the mentally retarded members of our society are finally being accorded their basic civil rights." *In re Grady*, 85 *N.J.* 235, 245, 426 *A.*2d 467 (1981). It has recognized that "[l]ike all other citizens, the mentally retarded have the right to pursue happiness," *New Jersey Ass'n for Retarded Citizens v. Human Servs.*, 89 *N.J.* 234, 252, 445 *A.*2d 704 (1982); *In re Grady, supra*, 85 *N.J.* at 274–75, 426 *A.*2d 467 (Handler, J., concurring), and that the mentally retarded have fundamental privacy rights regarding procreation and contraception, *In re Grady, supra*, 85 *N.J.* at 248–52, 426 *A.*2d 467; *see also City of Cleburne v. Cleburne Living Center*, 473 *U.S.* 432, 463, 105 *S.Ct.* 3249, 3266, 87 *L.Ed.*2d 313, 335 (1985) (Marshall, J., concurring in judgment in part and dissenting in part) (retarded persons entitled to the right to marry and to procreate, one of the "basic civil rights of man"). Moreover, as earlier noted, the Legislature itself was solicitous of the status of mildly-impaired adults in attempting to narrow the scope of the statute's protections.

Not all of those labeled "mentally retarded" need the special protection provided by *N.J.S.A.* 2C:14–2c(2), and therefore not all of the retarded should be included within *N.J.S.A.* 2C:14–1h's definition of "mentally defective." The degree of intellectual impairment varies widely among the retarded. *E.g., Diagnostic and Statistical Manual of Mental Disorders* 28–37 (3d ed. Rev'd 1987); Hayman, *supra*, 103 *Harv.L.Rev.* at 1214–15. As the Attorney General acknowledges, mentally-retarded per-

sons range "from the virtually independent to the totally dependent." Mental retardation is not easy to define and categorize. *See Penry v. Lynaugh*, 492 *U.S.* 302, 308 n. 1, 109 *S.Ct.* 2934, 2941 n. 1, 106 *L.Ed.*2d 256, 271 n. 1 (1989) (citing American Association of Mental Deficiency, *Classification in Mental Retardation* 1 (H. Grossman ed. 1983)); *In re Grady, supra*, 85 *N.J.* at 240 n. 1, 426 *A.*2d 467; *N.J.S.A.* 30:4–25.1(a)(5); Hayman, *supra*, 103 *Harv.L.Rev.* at 1246.

These significant policy considerations commend a narrow interpretation of the concept of mentally defective under *N.J. S.A.* 2C:14–1h. The statutory concept of "mentally defective" implicates both the intellectual or cognitive capacity and the volitional or consensual capacity of the individual with respect to personal sexual activity. The consensual capacity involves knowing that one's body is private and is not subject to the physical invasions of another, and that one has the right and ability to refuse to engage in sexual activity. The cognitive capacity, which is also implicit in the notion of consensual capacity, involves the knowledge that the conduct is distinctively sexual. In the context of this criminal statute, that knowledge extends only to the physical or physiological aspects of sex; it does not extend to an awareness that sexual acts have probable serious consequences, such as pregnancy and birth, disease, infirmities, adverse psychological or emotional disorders, or possible adverse moral or social effects.

Those considerations inform our formulation of a standard defining "mentally defective" for purposes of explaining and applying *N.J.S.A.* 2C:14–2c(2) and provide the context for our holding in this case. We now hold that a person is mentally defective under *N.J.S.A.* 2C:14–2c(2) if, at the time of the sexual activity, the mental defect rendered him or her unable to comprehend the distinctively sexual nature of the conduct, or incapable of understanding or exercising the right to refuse to engage in such conduct with another.

## III.

■ The Appellate Division reversed the conviction and entered a judgment of acquittal because, in its view, the evidence did not support a finding that M.R. did not know she had the right to refuse to engage in sexual acts. We disagree with its judgment.

Concededly the determination of whether evidence of mental defectiveness suffices to criminalize mutual sexual activity is difficult and subtle. Courts, albeit applying varying legal tests, have found sufficient evidence of mental defect when the impairment was similar to or greater than that of M.R. *E.g., Brooks v. State, supra,* 555 *So.*2d at 1137 (victim was very submissive seventeen-year-old boy with a full scale I.Q. of 69 and a mental age of 12); *People v. Gross, supra,* 670 *P.*2d at 800–02 (fifteen-year-old mentally-retarded girl with "an extremely simplistic understanding of sexual intercourse"); *Ely v. State,* 192 *Ga.App.* 203, 384 *S.E.*2d 268, 269 (1989) (fourteen-year-old girl who functioned at the level of a five- to ten-year-old, with a full scale I.Q. of 61); *State v. Gonsalves, supra,* 706 *P.*2d at 1336–39 (mentally-retarded woman with an I.Q. of 40, who functioned intellectually at the level of a three- or four-year-old); *People v. Washington, supra,* 167 *Ill.App.*3d at 78, 117 *Ill.Dec.* at 812, 520 *N.E.*2d at 1163 (1988) (victim admitted to a mental health center because she was "incoherent, non-responsive, and unable to understand directions"); *People v. McMullen, supra,* 91 *Ill.App.*3d at 186, 46 *Ill.Dec.* at 493, 414 *N.E.*2d at 215 (victim had an I.Q. of 45 to 54, functioned at the second-grade level; did not understand emotional aspect of sex, or real impact of having a baby, but did know the basics of sex and procreation; was particularly passive and could not find her own way around town); *People v. O'Neal, supra,* 50 *Ill.App.*3d at 906, 8 *Ill.Dec.* at 876, 365 *N.E.*2d at 1338 (victim with mental age of about five, who attended a school for mentally retarded, and whose understanding of sex was extremely limited); *Bozarth v. State,* 520 *N.E.*2d 460, 462 (Ind.Ct.

App.1988) (victim was deaf and legally-blind retarded woman with an I.Q. between 50 and 70, with an understanding of sexual matters equivalent to that of a six- or seven-year-old); *Hall v. State,* 504 *N.E.*2d 298, 298–99 (Ind.App.1987) (victim was fourteen-year-old special-education student who functioned at the second-grade level but understood sex and procreation); *Stafford v. State, supra,* 455 *N.E.*2d at 404 (victim was mentally-retarded woman with mental age of six to seven years, who understood the basics of sex and procreation); *State v. Chancy, supra,* 391 *N.W.*2d at 233–34 (victim was mildly-mentally-retarded woman with full scale I.Q. of 64, who was enrolled in a special education class; she functioned at level of a nine- to twelve-year-old and had difficulty understanding social situations); *State v. McDowell, supra,* 427 *So.*2d at 1350–51 (seventy-one-year-old senile victim suffered from "serious organic brain disease"; disoriented as to time); *People v. Easley, supra,* 42 *N.Y.*2d at 53, 396 *N.Y.S.*2d at 637, 364 *N.E.*2d at 1330 (woman with an I.Q. of 45 to 54, who attended a special school for the mentally retarded).

Other courts have found insufficient evidence of mental defect to support a conviction when the victim's knowledge of sex included awareness of some of its more obvious consequences. *E.g., State v. Johnson, supra,* 155 *Ariz.* at 26, 745 *P.*2d at 84 (victim was mentally disabled due to a head injury, but functioned largely independently; she was capable of handling a bank account and "had a normal knowledge about sex and procreation"); *People v. Blunt,* 65 *Ill.App.*2d 268 at 268–72, 212 *N.E.*2d 719, 720–21 (1965) (victim attended special education classes, had an I.Q. in the seventies, and knew about sex, pregnancy, venereal disease, and the moral implications of sex); *In re Darnell T.,* 134 *Misc.*2d 636, 512 *N.Y.S.*2d 639, 640–42 (Fam.Ct.1987) (lay-opinion evidence in a delinquency petition describing the victim only as retarded).

M.R.'s degree of mental impairment seems to fall somewhere in the middle of the two groups of cases. However, in evaluating the evidence of M.R.'s mental condition, we must apply the

test of "mentally defective" as entailing knowledge that conduct is sexual, an understanding that one has the right to refuse to engage in sex, and the ability to assert that right. Here M.R. described the sexual organs in the vocabulary of a very young child. She also apparently watched Spanish-language love stories on television, the sexual content of which was not fully explored. Further, when she complained of the incident, she described the encounter as a "rape." The evidence presented would permit a jury to find that M.R. had a rudimentary and childish understanding of some of the physical aspects of sexual conduct, but a jury could conclude also that her understanding of sexual conduct was incomplete and inadequate even with respect to the physical aspects of sex. Furthermore, even if M.R. was found to have a minimally-adequate comprehension of sex, it is not clear that a reasonable jury would determine that she understood that her body was private and that she had a right to be free from the invasions of others, and capacity to refuse to engage in sexual activity. There was evidence that M.R. had the social maturity of only an eight-year-old child and that she functioned at a socially-inactive level. The trial court itself perceived the victim's limitations when it said of defendant at the sentencing hearing, "He got convicted because he's a lecherous old fool and took advantage of a young kid that couldn't have her own mind because of her retardation. Let's call it what it is." Accordingly, we conclude that the evidence could support a finding that M.R. was mentally defective.

■ However, the trial court's charge to the jury failed to provide an adequate explanation of the standard for determining "mentally defective." The trial court believed that to articulate any definition beyond the statutory language of the statute itself was unnecessary. *E.g., Ely v. State, supra,* 192 *Ga.App.* at 205–07, 384 *S.E.*2d at 271–72; *Bozarth v. State, supra,* 520 *N.E.*2d at 462–64. We conclude that an instruction solely in the terms of the language of the statute will not give sufficient guidance to the jury and engenders too great a risk

that the jury's ultimate determination of guilt or innocence will be based on speculation, misunderstanding, or confusion. *State v. Concepcion*, 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988) ("it is not always enough simply to read the applicable provision of the criminal code"); *State v. Green*, 86 *N.J.* 281, 287–89, 430 *A.*2d 914 (1981). The jury must be given an instruction that follows a correct legal standard of mental defectiveness and explains that concept in the context of the evidence that relates to the complainant's mental condition and conduct. Because the statute makes clear that a mental defect may affect a person "temporarily or permanently," *see N.J.S.A.* 2C:14–1h, the specific facts in each case will inevitably be relevant. The trial court's instructions should inform the jury that the alleged victim's capacity to understand and consent to the proffered sexual conduct must be considered in the context of all of the surrounding circumstances in which it occurred.

## IV.

*N.J.S.A.* 2C:14–2c(2) imposes criminal liability only if the defendant "knew or should have known" that the complainant was mentally defective. The Appellate Division, having determined that its conclusion that the evidence of mental defectiveness was insufficient, barely addressed the knowledge-requirement issue. Nevertheless, it did state that "we find no evidence that defendant 'knew or should have known' that M.R. was mentally defective as required by *N.J.S.A.* 2C:14–2c(2)." 237 *N.J.Super.* at 433, 568 *A.*2d 111.

The knowledge requirement contains both a subjective element—whether defendant knew—and an objective element—whether defendant should have known. Defendant can avoid liability only if neither the subjective nor the objective element is proved. Specific intent is not required. *See People v. Davis*, 102 *Mich.App.* 403, 301 *N.W.*2d 871, 873–74 (1980) (statute saying actor "knows or has reason to know" of mental defect

eliminates liability only "where the mental defect is not apparent to reasonable persons").

The State argues that defendant likely spent a significant amount of time with the complainant, and that "[h]e could have and should have noticed [M.R.'s] mental problem after being with her for an extended period of time.... Thus, using an objective standard, defendant should have known [M.R.] had a mental problem." The State points out that defendant tried to evade the officer standing by his car and that defendant gave the police conflicting statements, and suggests that that is "indicative of a guilty conscience—that he knew [M.R.] was mentally defective." Even the trial court's sentencing comments point out the obviousness of M.R.'s mental impairment: "[M]y goodness, if you couldn't tell this girl was retarded, there's something wrong with you.... [A]nybody speaking with this girl for two minutes would have to know that she was retarded...."

Defendant does not necessarily deny that the complainant appeared slow. Rather, defendant argues that whether he should have known that the complainant was "retarded" (as the trial court phrased her condition) or "had a mental problem" (as the State characterizes it) is beside the point. The statute requires proof that defendant knew or should have known she was "mentally defective." *See, e.g., Garcia v. State*, 661 *S.W.*2d 96, 99 (Tex.Crim.App.1983) (en banc) (even if complainant was mentally defective, there was insufficient evidence to establish that defendant knew or should have known that). Although defendant is correct that mere knowledge of a mental problem does not equal knowledge of a "mental defect" for purposes of the statute, sufficient proof was presented at trial for a reasonable jury to infer that defendant knew or should have known the degree of M.R.'s mental impairment. Thus, if the evidence of the degree of her impairment demonstrated a "mental defect" within the meaning of the statute, then for a jury to conclude that defendant was or should have been aware

of her condition and be held accountable for knowledge of her defect was not unreasonable.

## V.

The judgment of the Appellate Division is modified to remand the matter for a new trial.

*For modification and remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.