**Billie Joe STAFFORD, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 2–882A232.**

Court of Appeals of Indiana, Second District.

Oct. 26, 1983.

Rehearing Denied Dec. 6, 1983.

John R. Cromer, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Cynthia Sue Stanley, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Defendant Billie Joe Stafford (Stafford) appeals his conviction of rape, a class B felony, I.C. 35–42–4–1(a)(3) (Burns Code Ed., Repl.1979).[1] He raises the following issues on appeal:

1) whether it was a manifest abuse of discretion to determine the victim was competent to testify;

2) whether it was error to refuse to admit as evidence the results of a polygraph examination;

3) whether there was sufficient evidence to support the conviction; and

4) whether the sentence imposed by the trial court was excessive and unreasonable.

We affirm.

## I. COMPETENCY TO TESTIFY

A.B., the victim of the alleged sexual assault, was called as a witness by the State. At that time, Stafford objected "to

---

**1.** I.C. 35–42–4–1 (Burns Code Ed., Repl.1979) provides as follows:

"(a) A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when. . . .

(3) The other person is so mentally disabled or deficient that consent to sexual intercourse cannot be given; commits rape, a class B felony. . . ."

any proffered testimony from the prospective witness", Record at 266, because the witness was unable "to appreciate the nature and extent of punishment that is possible by not following the obligation of the oath." Record at 267. In support of his objection, Stafford referred to the report of the two court appointed psychiatrists who had previously examined A.B. When Stafford advised the trial court he had no other evidence to present on the issue, the trial court examined the proffered witness. This examination revealed A.B.'s understanding of the difference between the truth and a lie and her promise to tell the truth. Further examination by the State revealed A.B. knew her mother would not like it if she (A.B.) told lies and would be angry with her, that she further knew the "Judge" would be angry if she told lies, and that she could "get in trouble" if she told lies.

The psychiatric report stated A.B. was twenty-five (25) years of age at the time of her examination and was moderately mentally retarded. The report further recited:

"... This girl was alert and cooperative for the examination. She came into the room and stated she was there because she had been raped by Bill Stafford, and she gave the date of that as June 23, 1981. She did give considerable detail about what had happened that day, and her story conformed to the information supplied through the Court. She indicated that the case was still going on. She reported that she lives with her mother, whom she said was sixty-one years old. Her father died last Christmas of cancer, and she does not have any brothers or sisters. She described her health as being pretty good, and denied any health problems other than having hayfever. She told of the different schools that she had attended, and said that she was in special education. She was not given any formal psychometric tests, but it was evident from relatively simple questions that she is moderately mentally retarded. She was able to read words up to six letters and had comprehension of what she did read. She had very rudimentary understanding about court rooms and court room procedures. Her general reactions and her behavior during the examinations were very childlike. We found no indication of delusional thinking or of her having any hallucinatory experiences. Her general concepts were considered to be that of a six or seven year old child, the difference between right and wrong. For example, she declared that it was wrong to steal or take things that did not belong to you, and that it was wrong to hurt someone, and that it was wrong to tell lies. Her ability to form more complex concepts or to understand them was limited. Her judgment was considered to be equivalent to her mental age and reflected the immaturity of a child. Nevertheless, we believe that she does have the mental capacity to understand an oath as she equates this to telling the truth. She was able to tell her story in a consistent fashion, and did stick to the details of the story in a consistent fashion, and did stick to the details of the story when questioned at different times and in different approaches. Therefore, we do believe that she does have the competency to testify as a witness. Because of her emotional and mental immaturity, she does get frightened easily and may have difficulty in handling aggressive approaches toward her. If she is treated in a fashion compatible with her mental age, we believe that she will be able to respond to questions couched in very simple and concrete terms."

Record at 110–111.

All persons, with certain exceptions, are competent to testify. I.C. 34–1–14–4 (Burns Code Ed., 1973). Consequently, a party objecting to a proffered witness' incompetency has the burden of establishing that incompetency. *Ware v. State,* (1978) 268 Ind. 563, 376 N.E.2d 1150. However, the issue of competency is not one of fact but one of law to be decided by the trial court. *Ware.* Therefore, as a reviewing court, we interfere with the trial court's decision only if a manifest abuse of discretion appears. *Ware.*

■ Unsoundness of mind is not a per se disqualification of a witness. *Ware.* Stated positively, the test of a witness' competency is:

> "The test of competency of a witness is whether the witness has sufficient mental capacity to perceive, to remember and to narrate the incident he has observed and to understand and appreciate the nature and obligation of an oath."

376 N.E.2d at 1151.

■ Cognizant of that test and Stafford's burden of establishing A.B.'s incompetency, we fail to find any manifest abuse of discretion. The psychiatric report evidenced her consistency in reporting the alleged incident, her ability to remember and recount in detail, the absence of delusional thinking or hallucinatory experience, her recognition of the difference between right and wrong and her concept a lie was wrong. It also included the examiners' expert opinion A.B. has "the mental capacity to understand an oath as she equates this to telling the truth." Record at 111. This opinion was further attested by the voir dire examination of A.B. during which she verbalized her understanding of the difference between the truth and a fabrication and that she would get in trouble if she told a lie, and her promise to tell the truth.

## II. POLYGRAPH EXAMINATION

■ Stafford argues the trial court erred in sustaining the State's objection to his offer of the results of his polygraph examination into evidence. We disagree.

Stafford concedes present Indiana cases hold the results of polygraph examinations are admitted only if both parties stipulate to their admissibility. *Dean v. State,* (1982) Ind., 433 N.E.2d 1172. However, he claims the most important reason for their inadmissibility is polygraphs are not considered reliable enough to present to a jury for fear a jury will place undue weight on the results. This reason, he asserts, is not rele-

vant in the instant case because it was tried to the court.

In *Filler v. State,* (1981) Ind.App., 421 N.E.2d 1146, Filler took a polygraph test and wanted to testify to the results in a trial on his parole revocation before the court. Filler made the same argument Stafford makes in the instant case. This court in *Filler* rejected the argument and affirmed the court's exclusion of the test results.

The trial court did not err in refusing to admit into evidence the results of Stafford's polygraph examination.

## III. CONSENT

■ Stafford argues the evidence is insufficient to support his conviction under I.C. 35–42–4–1(a)(3), because the State failed to prove A.B. was incapable of giving consent. We disagree.

The statute under which this prosecution was brought requires the State to prove beyond a reasonable doubt, the victim is "so mentally disabled or deficient that consent to sexual intercourse cannot be given...." I.C. 35–42–4–1(a)(3). Neither the statute nor existing case law addresses the components of this element of incapacity to consent. We have found guidance, however, in the case law of our sister state Illinois that addresses the issue of a rape victim's capacity to consent.

The Illinois courts have adopted the rule the "capacity to consent presupposes an intelligence capable of understanding the act, its nature and possible consequences."[2] *People v. McMullen,* (1980) 91 Ill.App.3d 184, 46 Ill.Dec. 492, 495, 414 N.E.2d 214, 217 (citing *People v. Blunt,* (1965) 65 Ill.App.2d 268, 274, 212 N.E.2d 719, 722); *People v. O'Neal,* (1977) 50 Ill.App.3d 900, 8 Ill.Dec. 871, 365 N.E.2d 1333. In *McMullen,* where the court concluded the victim was mentally incapable of consenting to intercourse, the victim's I.Q. was 45 to 54, the victim was

**2.** At the time of the *McMullen* and *O'Neal* cases the Illinois rape statute provided, in words very similar to the Indiana rape statute, that an element of rape can be the fact that the

"female is so mentally ... deficient that she cannot give effective consent to intercourse." Ill.Rev.Stat.1975 and 1979, Ch. 38, par. 11–1(a)(2).

passive and susceptable to manipulation, and the victim did not understand the social and psychic consequences of sexual activity, though she did have some understanding of the physical nature of sexual activity and knew "where babies come from." In *O'Neal,* where the court also concluded the victim was mentally incapable of consenting to intercourse, the victim had a mental age of five years, could perform only very simple mental tasks, and demonstrated little understanding in court of the implication of sexual intercourse. By contrast, in *Blunt,* where the court concluded the victim was mentally capable of consenting to intercourse, the victim had an I.Q. in the seventies, could travel by bus, cook, clean, and shop, knew sexual intercourse could result in pregnancy and venereal disease and understood the moral aspects of sexual activity.

Adopting the standard that capacity to consent presupposes an intelligence capable of understanding the act, its nature, and possible consequences and coupling it with our standard of review,[3] there is sufficient evidence from which the fact finder could have reasonably concluded, beyond a reasonable doubt, that A.B. was incapable of giving consent to sexual intercourse with Stafford.

■ The evidence reveals A.B.'s limited intelligence, her mental age of six (6) to seven (7) years, and its consequential limitation on her judgment. She is described as being able to perform functions necessary to care for her personal needs. She has never worked. At home she exhibits the ability to perform simple functions such as retrieving the mail, although her main time commitment is watching television. Dr. Schuster, an examining psychiatrist, described A.B. as having

"a passive personality structure subject to the desire to please people, to get along with people, the matter of being influenced by praise and influenced by fear in keeping with her general emotional age . . ."

Record at 216, Deposition at 9.

He further testified though A.B. could verbally consent to sexual intercourse, her general judgment level would interfere with a true consent. Similarly, A.B.'s family physician testified A.B. would be unable to give meaningful consent to sexual intercourse based upon her mental age, her desire to please, and her fear and uncertainty if she were in a room, undressed, and alone with a man who attempted to engage her in sexual intercourse. Finally, there is evidence A.B.'s understanding of the reproductive process is, at best, rudimentary.

## IV

Stafford argues the ten-year sentence imposed by the trial court was excessive and unreasonable. Stafford was convicted of rape, a class B felony. I.C. 35–50–2–5 (Burns Code Ed., Repl.1979) provides a person who commits a class B felony shall be imprisoned for a fixed term of ten years, with not more than ten years added for aggravating circumstances or not more than four years subtracted for mitigating circumstances.

■ I.C. 35–50–1–1 (Burns Code Ed., Repl.1979) vests in the trial court the authority to sentence a defendant convicted of a crime. A finding of mitigating factors is discretionary in the trial court. *Cornelius v. State,* (1981) Ind., 425 N.E.2d 616. The sentence is not disturbed on appeal unless it is manifestly unreasonable. *Stanley v. State,* (1982) Ind.App., 435 N.E.2d 54. This presumptive sentence is not.

Judgment affirmed.

BUCHANAN, C.J., concurs.

SULLIVAN, J., concurs.

---

**3.** When reviewing a question of the sufficiency of the evidence, we neither weigh the evidence nor resolve questions of credibility. We look only to the evidence and all reasonable inferences which support the finding, and if we find substantial evidence of probative value from which the fact finder could conclude guilt beyond a reasonable doubt, then we must affirm. *Resnover v. State,* (1982) Ind., 434 N.E.2d 78.