Donald E. CRIDER, Appellant–
Defendant,

v.

Elsie CRIDER, Appellee–Plaintiff,

v.

Perry Oliver CRIDER, Elsie E. Crider, William O. Crider, Vica Elizabeth Smith and Carolyn L. Norfleet, Appellees–Third Party Defendants.

No. 79A02–9209–CV–459.

Court of Appeals of Indiana,
Second District.

June 13, 1994.

Rehearing Denied July 21, 1994.

Gary G. Hanner, Hanner Hanner & Hanner, Rockville, for appellant.

James A. Gothard, Gothard & O'Connell, Lafayette, for appellees Elsie E. Crider, William O. Crider, Vica Elizabeth Smith, and Carolyn L. Norfleet.

Eric H. Burns, Hanna, Gerde & Burns, Lafayette, for appellee Perry Oliver Crider.

FRIEDLANDER, Judge.

On December 5, 1990, Elsie Crider filed a claim to set aside two transfers of real estate that her husband, Perry, had made to their son, Donald.[1]  *Record* at 23.  On July 8, 1991, Donald Crider filed a third party complaint to quiet title, naming as defendants both of his parents, his brother and his two sisters.  *Record* at 49.  Following a bench trial in April of 1992, the trial court entered judgment setting aside one of the two real estate conveyances from Perry to Donald, reverting ownership of a 110–acre tract of land to Perry.  *Record* at 157–161.  Following the denial of his motion to correct errors, Donald perfected this appeal.  We affirm.

Donald raises two issues for our review, which we have restated as follows:

I. Did the trial court err by requiring Donald to rebut, by clear and unequivocal evidence, the presumption that the 110–acre land transfer from his father to himself was fraudulent even though the conveyance was one from a father to a son?

II. Did the trial court err by not allowing certain testimony to be considered for the truth of the matter asserted therein?

*FACTS*

The facts most favorable to the judgment reveal the following.  In 1926, Elsie and Perry Crider were married.  Early in their marriage, the two purchased a farm of approximately 117 acres for $5,000.  To pay for the farm, Perry borrowed $2,000 from his sister and Perry and Elsie jointly borrowed $3,000 from the bank.  Because of an earlier experience Perry had with his parents, he refused

---

1. In May of 1976, Perry deeded 6.92 acres in fee to Donald.  In July of 1989, Perry deeded a remainder interest in 110 acres to Donald, retaining a life estate for himself.

to have Elsie's name placed on the deed. Instead, Perry insisted that the farm be titled in his name only.

Elsie and Perry lived on the farm together from 1944 until 1976. During this time, Elsie and Perry had four children: Donald, William, Elizabeth (Betty) and Carolyn. Everyone in the family helped Perry work the farm. As the children grew older, they moved away from the farm, but periodically some would return. At one time, Donald and his wife, Millie, as well as Betty and her two children, all shared a small, three-room house on the farm. Following a "knock down drag out" between Donald and Betty, Perry ordered both families to immediately leave the farm house, which they did. *Record* at 291. Several months later, Donald and Millie returned.

In 1967, Donald moved a fertilizer shed and part of a trailer onto a five-acre portion of the farm selected by Perry. Two years later, Donald and Perry had completed a foundation for a shed and Donald and Millie began living on the farm full time. Donald's residence and Perry's residence were within sight of each other.

In either 1974 or 1975, Donald called a family meeting which was attended by all of the children, as well as Elsie and Perry. Donald's purpose for calling the meeting was to ask the family members if they would agree to let him own the five (5) acres of land upon which he lived as his share of the farm provided Perry would also agree. Donald wanted to enlarge his residence and, because he and his father "were constantly at war and always [had] been," Donald desired a section of land which he owned and over which Perry had no control. *Record* at 295. Since Donald already had buildings on the acreage, Elsie and the children had no problems with, and agreed to, Donald acquiring the five (5) acres from Perry as his share of the farm. On May 14, 1976, Perry deeded approximately 5.7 acres of the family farm to Donald.[2]

Sometime in 1976, Elsie moved off the farm because "[Perry] used his fist once to [sic] often.... [She had] 50 years of it and [she] figured that was enough." *Record* at 286–7. After a few months had passed, Perry began visiting Elsie weekly at her residence. Perry tried to talk Elsie into moving her trailer onto the farm, but Elsie declined. She did, however, visit Perry occasionally. Elsie noticed that, beginning in approximately 1976, Perry started imagining things. For instance, he imagined that a family lived in an attic above his trailer, that people rode horses around his trailer in the winter without leaving tracks in the snow, and that people were stealing food from his refrigerator and cabinets. During this same time, Perry became suspicious of others whom he believed were trying to take his land away from him.

In October of 1984, Perry saw a neighbor, Tom, jogging out of the driveway to the farm and thought that Tom had been to Perry's house.[3] Perry chased Tom down and attacked him with a cane, knocking Tom's glasses off. Tom ran home, called Donald's wife, Millie, told her about the incident and stated that he intended to report the incident to the police. Millie called Donald at work, told him what had happened, and, shortly thereafter, Donald met with his mother and the police at his mother's trailer. After Donald provided the police with the necessary information about Perry and signed the required papers, the police picked Perry up and transported him to Wabash Valley Hospital Mental Health Care, Inc. (Wabash). Perry was detained at Wabash on an emergency basis until he was temporarily committed for ninety (90) days. Perry's hospital admission and discharge summary reads in part as follows:

> "*MENTAL STATUS EXAMINATION:* Patient is alert, cooperative and oriented to place, person, month, year, day of week but not date. He is dressed in matching gray work clothes and wears torn, dirty leather boots. He is somewhat malodor-

---

2. On June 5, 1989, the deed was re-recorded to correct the amount of acreage transferred from 5.70 acres to 6.92 acres.

3. In 1971, Perry sold to several neighbors an easement which ran through the middle of the lane to the farm. Tom was apparently one of these neighbors.

ous and is in need of a bath. He was fairly pleasant and friendly throughout most of the interview. He became agitated and hostile after completion of the neurologic examination and claimed that he was 'beaten' with a hammer. Speech was quite circumstantial and he would frequently digress, but most of his responses were fairly relevant and coherent. His thoughts would tend to ramble and wander. He did not appear to be significantly depressed or elated. He felt angry for being 'shanghaied.' His thoughts were occupied with a paranoid delusion involving the plot by the Russians, the Jews and his neighbors to drive him off his land. He believes the Russians have declared their power over one-third of Georgia and are now attempting to gain control of the Indiana cornbelt. His thoughts are rather circumstantial and characterized by excessive attention to detail. He admits to hearing voices that emanate from hidden microphones. He believes the voices are present because his dog barks. When questioned regarding his memory, he became quite defensive. . . . His judgement is poor, based on his recent behavior. He has no insight into his illness. He was judged to be potentially dangerous to others on admission."

*Record* at 509.

In November of 1984, Donald petitioned the court to be appointed temporary guardian of Perry. In his petition, Donald alleged that Perry "was incapable by reason of old age and infirmity of either managing his property, or caring for his person." *Record* at 873. Although Perry signed a consent to the appointment of Donald as his guardian, Donald later dismissed his petition because the other family members were opposed to the idea of Donald being Perry's guardian. On December 7, 1984, Perry was discharged from Wabash and returned to his trailer. Between 1989 and 1991, Donald, who was living approximately 500 feet from Perry, assisted Perry in paying most of his bills. Prior to that time, Donald had been simply checking Perry's books for him.

In May of 1989, Donald asked his attorney to prepare a warranty deed which would transfer the remaining 110 acres of the family farm from Perry to Donald, with Perry retaining a life estate. On May 30, 1989, Donald's attorney mailed the prepared deed to Donald, with instructions that the deed must be recorded when signed. On July 5, 1989, Donald took his father to the bank to make a deposit. After Perry had finished his banking business, Donald escorted Perry to the bank's notary public so that she could witness and notarize Perry's signing of the deed. Along the way, Donald and Perry did not discuss what Perry was about to sign. On July 7, 1989, Donald's attorney caused the deed to be recorded. Donald's attorney did not see Perry during this transaction and none of the family members were notified of the land transfer.

Just before July 4, 1989, Donald called his mother and asked her if she would like to spend the holiday with him. Elsie accepted Donald's invitation and spent the entire day and evening of July 4 at her son's house. During the day, Elsie saw quite a bit of Perry, who constantly wandered in and out of Donald's home, acting a bit erratically and appearing to be lost. For instance, on one occasion, Perry came into Donald's house and asked if Elsie had left. Elsie, who was sitting right in front of Perry at the time, simply reached out, touched Perry's arm and told him that she was still there.

In August of 1990, Donald had a long telephone conversation with his brother, William, concerning certain of their father's business matters. During the conversation, Donald told William that he had Perry sign a paper which put Donald "in the driver's seat now." *Record* at 438. According to Donald, he had "caught [Perry] in a weak moment and boy [he had taken] advantage of that." *Record* at 439. Because Donald would not tell William what paper their father had signed, William went to the Tippecanoe County Recorder's Office the next day and discovered that Perry had transferred the entire farm to Donald.

On December 5, 1990, Elsie filed a claim to set aside the two transfers of real estate that Perry had made to Donald. In her claim, Elsie alleged fraud, duress, undue influence and breach of a fiduciary relationship on the

part of Donald in acquiring the real estate and lack of capacity on the part of Perry in conveying the real estate. On July 8, 1991, Donald filed a third party complaint to quiet title, naming as defendants both of his parents, his brother and his two sisters. Donald alleged that he owned the two tracts of land in fee simple, with rights superior to those of the rest of his family. Following a bench trial in April of 1992, the trial court entered requested findings of fact and conclusions of law. Those findings and conclusions, as well as the court's judgment, read in relevant part as follows:

## "FINDINGS OF FACT

1. The Defendant, Donald E. Crider is the son of Perry Oliver Crider and the Plaintiff, Elsie E. Crider is the wife of Perry Oliver Crider.

2. Perry O. Crider and Elsie Crider are the parents of four adult children, William O. Crider, Donald E. Crider, Vica Elizabeth Smith, and Carolyn L. Norfleet.

3. Perry O. Crider purchased the entire tract of land approximately 116 acres, which is the subject matter of this lawsuit with some financial assistance from his wife; however, the property was placed solely in the name of Perry O. Crider.

4. The Plaintiff, Elsie E. Crider and Perry O. Crider were married in 1926 and said relationship continues until this date.

5. The Defendant, Donald E. Crider has been able over the years to overcome the will and desire of his father, Perry Oliver Crider.

6. The defendant, Donald E. Crider, filed a verified petition for the appointment of a guardian over the person and estate of Perry O. Crider alleging that the said Perry O. Crider was incompetent.... Contained in said petition is the allegation that the alleged incompetent is incapable by reason of old age and infirmity of either managing his property or caring for his person. Said guardianship petition referred to herein was dismissed on September 9, 1985 at the request of Donald E. Crider.

7. Perry O. Crider was a patient at Wabash Valley Hospital Mental Health Center, Inc. from October 23, 1984 to the date of his discharge December 7, 1984. The hospitalization was pursuant to Court Order.

8. On May 14, 1976, Perry Oliver Crider deeded by Warranty Deed certain real estate to Donald E. Crider which said real estate was later described as containing 6.92 acres....

9. The Defendant, Donald E. Crider requested his attorney to prepare the Warranty Deed which was signed by Perry Oliver Crider July 5, 1989. Said Deed was mailed to the Defendant by his attorney on May 30, 1989.

10. The Defendant, Donald E. Crider assisted his father in paying his bills particularly in the years 1989, 1990, and 1991.

11. While the Defendant was transporting his father to the Bank in order to sign the July, 1989 Deed, there was no discussion concerning the impending Deed or impending signature of the same and neither was there any discussion after having left the Bank in July, 1989 concerning the signing of the Warranty Deed.

12. The Defendant, Donald E. Crider was physically present when Perry Oliver Crider signed the Warranty Deed on July 5, 1989 and in fact drove Perry Oliver Crider to the Bank where his signature was notarized.

13. Perry Oliver Crider deeded by Warranty Deed to Donald E. Crider on July 5, 1989 the balance of the farm owned by Perry Oliver Crider which is generally described as 100 acres more or less, retaining for himself a life estate in said property....

14. Perry Oliver Crider's mental condition is presently such that he is under a guardianship as a result of a petition filed by Donald E. Crider and Order of Tippecanoe Circuit Court on November 2, 1990.... Pursuant to the Court Order, Donald E. Crider was appointed temporary guardian over Perry Oliver Crider's person and Lafayette Bank & Trust Company was appointed temporary guardian over Perry Oliver Crider's Estate, both

temporary guardianships have been made permanent.

15. Contained in the petition for appointment of guardian on behalf of Donald E. Crider is an allegation that Perry Oliver Crider was in need of a guardian due to his inability to maintain and care for his financial affairs and person and that he suffers from old age and infirmity, as well as senility.

16. The mental condition of Perry Oliver Crider has continually deteriorated to such an extent that on July 4, 1989 he was unable to recognize his wife of 63 years.

17. The physical condition of Perry Oliver Crider is such that his eyesight is very poor and he only has a minimal grade level of education of eighth grade; however, in spite of such limited mental ability no one read to Perry Oliver Crider the contents of the July 5, 1989 Deed.

18. In September, 1990, the Defendant, Donald E. Crider expressed to his brother that he was in the driver's seat because he had a paper Dad had signed and that 'I took advantage while the old man (Perry Oliver Crider) was in the mood'.

19. That in the early 1970s a family meeting was conducted at which time it was agreed that the Defendant, Donald E. Crider would be entitled to [have] conveyed to him a portion of the family farm which was approximately 5 acres. As a result of such family agreement, the Defendant did obtain title to the property as a result of a Warranty Deed dated May 14, 1976 from Perry Oliver Crider which subsequently was described as 6.92 acres.

20. Perry O. Crider is presently a residential patient at Lafayette Healthcare, his date of birth June 26, 1904.

## CONCLUSIONS OF LAW

1. The relationship which existed between the Defendant, Donald E. Crider and Perry Oliver Crider was that of son and father and further, their relationship was such that the Defendant, Donald E. Crider was able from time to time to exert his will over his father and also the relationship was such that Donald E. Crider was the dominant person in whom trust and confidence was reposed by his father, Perry Oliver Crider.

2. The resulting transfer of approximately 110 acres ... from Perry Oliver Crider to Donald E. Crider resulted in an advantage to the dominant person, Donald E. Crider, and as such the law imposes a presumption that [the] transaction was the result of undue influence exerted by the dominant party[,] constructively fraudulent and thus void.

3. Finding further that the transfer of real estate from Perry Oliver Crider to Donald E. Crider effective May 14, 1976 and later described as 6.92 acres was not the result of undue influence, but rather was the result of a family agreement.

4. Finding that the Defendant, Donald E. Crider has not demonstrated that the transaction of July 5, 1989 was in fact one that was held at arms length and valid and that he has failed in his burden of proof to rebut the presumption of fraud by clear and unequivocal evidence.

## JUDGEMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. That the Defendant and Third Party Plaintiff, Donald E. Crider upon his Amended Complaint to quiet Title and to Remove Cloud on Real Estate shall be granted as the same applies to [the 6.92 acres of land] ... located in Wabash Township, Tippecanoe County, Indiana.

2. Finding further that [Donald] is the fee simple owner of said real estate and that his interest is superior to all other persons named in said Complaint and accordingly those individuals shall no longer be entitled to make any claim of interest in said [6.92 acres].

3. Finding further that the Warranty Deed executed by Perry Oliver Crider July 5, 1989 conveying the [110 acres] to Donald E. Crider is hereby set aside and declared void and thus said Deed is hereby set aside

and the property shall revert to the ownership of Perry Oliver Crider...."
*Record* at 129–135.

## I.

We address first whether the trial court erred by requiring Donald to rebut, by clear and unequivocal evidence, the presumption that the 110–acre land transfer from his father to himself was fraudulent even though the transfer was one from a father to his son.

■ We note that this was a bench trial in which the trial court made requested findings of fact and conclusions of law. When we review a trial court's judgment based upon findings of fact and conclusions of law, we will reverse only if the findings and conclusions drawn therefrom are clearly erroneous. A judgment is clearly erroneous when it is unsupported by the findings and conclusions. Findings of fact are clearly erroneous if the record fails to disclose any facts in evidence or any reasonable inferences from the evidence in support of the findings. *Donovan v. Ivy Knoll Apts. Partnership* (1989), Ind.App., 537 N.E.2d 47, 50. We will not reweigh the evidence and we will affirm the trial court unless the evidence, when viewed in a light most favorable to the judgment, points uncontrovertibly to an opposite conclusion. *Id.* at 50–51.

■ In Indiana, various legal and domestic relationships raise a presumption of confidence and trust as to the subordinate party on the one hand and a corresponding influence as to the dominant party on the other. *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163, 1166–1167. These relationships include, among others, parent and child. *Id.*[4] Where the relationship is one of parent and child, if the plaintiff demonstrates both that such a relationship exists and that the questioned transaction between the two parties resulted in an advantage to the dominant party in whom the subordinate party had reposed both their trust and confidence, "the law *imposes a presumption the transaction was the result of undue influence exerted by the dominant party,* constructively fraudulent, and thus void." *Id.* (emphasis in original). When this occurs, the burden shifts to the dominant party to demonstrate that the questioned transaction was in fact an armslength transaction and thus valid. *Id.* The question of which party has attained the position of the dominant party, under the evidence, is a question for the trier of fact. *Moore v. Harvey* (1980), Ind.App., 406 N.E.2d 354, 359.

Undue influence, sufficient to invalidate a deed, is "the exercise of sufficient control over the person, the validity of whose act is brought into question, to destroy his free agency and constrain him to do what he would not have done if such control had not

---

4. The majority of judges on this panel agree that, if there is any validity to indulgence in a presumption of parental domination, it should only be with respect to a minor child living in the parent's household. In this day and age, they continue, one cannot state with accuracy that all parents must be assumed to occupy a dominant position vis-a-vis their adult children. According to the majority, the realities of modern society and modern relationships require that the dominance of one party over the other in a parent-child relationship be established by evidentiary proof and not by resort to a fictional presumption. *See Reed v. Reed* (1971), 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (preference given male applicants for letters of administration in estates based upon presumption of ability or competence no longer permitted); *See also In re Marriage of Myers* (1979), 180 Ind.App. 284, 387 N.E.2d 1360 (that maternal parent should have custody of minor children following dissolution no longer assumed); IC 31–1–11.5–12 and IC 31–1–11.5–11(e) (that former wife unable to contribute financially to support of children or unable to be gainfully employed no longer assumed or presumed).

While the writing judge does not necessarily disagree with the majority's position, he believes that the current law in Indiana regarding conveyances from a parent to a child clearly requires this court to assume, at the outset, that the parent is the dominant party. *See Westphal v. Heckman* (1916), 185 Ind. 88, 113 N.E. 299, 301 ("In the relation of parent and child the parent is assumed to be the dominant party...").

Although the judges on this panel may disagree as to whether, when a parent conveys to a child, we should presume at the outset that the parent is the dominant party, all judges on this panel do agree that, because the facts found by the trial court indicated that the conveyance in question was obtained by the actual undue influence of Donald over his father, Donald was required to demonstrate that the transfer in question was in fact valid.

been exercised." *Hunter v. Milhous* (1973), 159 Ind.App. 105, 305 N.E.2d 448, 459.

Donald argues that the burden never should have shifted to him to demonstrate that the questioned land transfers from his father to himself were made at arms length and thus valid. Donald contends that the law in Indiana has long been that, when a father transfers land to his son, the existence of the father/son relationship, even when coupled with the father's infirmities, does not raise a presumption of undue influence by the son in acquiring the land. According to Donald, a gift from a parent to a child is natural and presumed proper and a trial court's decision regarding whether to set aside such a gift must be based upon the actual exercise of undue influence and not upon a presumption of invalidity.

To support his argument, Donald first directs us to *Teegarden v. Lewis* (1895), 145 Ind. 98, 44 N.E. 9. In *Teegarden*, the plaintiff alleged, among other things, that a daughter and her husband had "unduly importuned, persuaded, and influenced" the daughter's deceased father into gifting the two $3,850. *Id.* 44 N.E. at 10. Following a trial, a jury found the following: (1) the father had been of unsound mind at the time he gave the money to his daughter and her husband; (2) the father, who had been "old, weak, and childish" for the final two years of his life, had relied upon the son-in-law to go with him and assist him in transacting all of his financial business; (3) during these two years, the father had lived with his daughter and her husband, and had been dependent upon the two for his personal care, for attention and for a home; (4) the daughter and her husband had not demonstrated that they had rightfully received the money; and, (5) the two had wrongfully converted the father's money to their own use. *Id.* at 10. The trial court judgment was against the daughter and her husband and the two appealed.

In reversing the trial court's decision on this issue, our supreme court first recognized the general rule "that one occupying a fiduciary relation must, when the question is made, establish his right in equity and good conscience to any advantage gained by him

from or through his principal, or his principal's business". *Id.* The court went on to state that "there can be no doubt that the same rule applies where from the superiority of one side, and the weakness, partial incapacity, or dependence of the other, a substantial and apparently unconscionable advantage has been gained." *Id.* at 11. The court next reiterated what the jury had found and then pointed out what the jury had not found. As the supreme court noted:

> "There is no finding that [the father] was subject to, or easily influenced by, [the daughter and her husband's] persuasion. There is no finding that they exercised any persuasion to obtain the gift. Nor does it appear that at the time of making it he had no other property, nor that he, by making it, dealt unjustly or with inequality with his other children."

*Id.* at 11.

In addressing the appellants' request for the court to distinguish between cases where the ordinary fiduciary relationship exists, (such as attorney/client and principal/agent), and those where the relationship is parent/child, the supreme court determined that "the distinction contended for must rule the present inquiry." *Id.* at 12. The court stated that, as for the daughter, the only evidence which could raise the presumption of undue influence was that she had been a daughter who had discharged a moral obligation of supplying a home to, and caring for the personal needs of, her father, who had become aged, weak and childish. As for the son-in-law, the only evidence which could raise the presumption of undue influence was that he had gone with and assisted his father-in-law in the father-in-law's business affairs. The court declared that more must appear as to both appellants to support the conclusion that the father had been under the superior control or equitable guardianship of the appellants. The court concluded,

> "If there is any strength in the exception to the general rule, it is indispensable that some element of positive fraud shall be found. The conduct of the appellants with reference to this gift, so far as the facts appear, is not only not objectionable, but it is highly commendable, save only, possibly,

in receiving the gift from one mentally weak. Mental weakness alone is not claimed to be sufficient to avoid the gift. Neither the weakness of [the father], nor the control of his affairs, as found, can authorize the conclusion that he was under the superior control or equitable guardianship of the appellants. *Unless it can be said that he was in a situation that their will could probably be substituted for his, there can be no constructive fraud.*

*Id.* at 12. (emphasis added).

Unlike *Teegarden,* however, in the case before us, the trial court found that Donald had in fact exercised persuasion to obtain the gift from his father by taking advantage of his father while his father "was in the mood". *Record* at 132. Furthermore, the trial court specifically found that, over the years, Donald, the son, had been able to overcome the will and desire of Perry, his father. *Record* at 130. These findings, which were supported by the evidence, were sufficient to raise the presumption of undue influence on the part of Donald and the trial court did not err by requiring Donald to rebut the presumption by clear and unequivocal evidence. *See Lucas, supra* (where the relationship is that of parent/child and the questioned transaction between the two results in an advantage to the dominant party, the dominant party must rebut, by clear and unequivocal evidence, the presumption of fraud).

Next, Donald directs us to *Westphal v. Heckman* (1916), 185 Ind. 88, 113 N.E. 299, to support his argument that the trial court erred by requiring him to rebut a presumption of undue influence in a conveyance from a father to a son. However, *Westphal* is also of no avail to Donald.

In *Westphal,* our supreme court considered the issue of whether the legal presumption that a son possessed an undue influence over his father should arise merely from the fact that the father deeded land to the son without any consideration. In resolving this issue, the court stated:

"It is the province of the trial court to draw the proper inference from the facts proved, and thus to find the ultimate or inferential fact, and the failure to find the ultimate fact must be deemed a finding against the party having the burden of proof. *It thus appears that the facts found do not show that the conveyance in question was obtained by the actual undue influence of the son over the father.* It remains to be considered whether the mere fact that the deed was made from a father to his son without any consideration gives rise to a legal presumption that the son possessed an undue influence over his father.

There are certain legal and domestic relations in respect to which the law raises a presumption of trust and confidence on one side and a corresponding influence on the other. The relation[ship] of . . . parent and child[ ] belong[s] to this class . . . Where such a relation exists between two persons and the one occupying the superior position has dealt with the other in such a way as to sustain a substantial advantage, the law will presume that improper influence was exerted and that the transaction is fraudulent. (citation omitted).

This so-called presumption, when indulged, arises out of relations which exist between the contracting parties regardless of any facts or circumstances having a tendency to show that a confidence was reposed by one of the parties and an influence gained by the other. Proof of the existence of such a relation between the parties establishes prima facie that the dominant party to such relation occupies a position of trust and confidence which he must not abuse. This rule, however, is applied only as against the one who is assumed to be the dominant party in the relation shown. *In the relation of parent and child the parent is assumed to be the dominant party, and, where one seeks to show that the child is the dominant party, he must do so by showing the condition and situation of the parties, their treatment of each other, and other circumstances from which such ultimate fact may be inferred, and unless such fact is found by the court or jury trying the issue he cannot prevail.* This court has held that no presumption of fraud or undue influence arises in a case of conveyance

from a parent to a child on account of the mere existence of such relation."

*Id.* 113 N.E. at 301. (emphasis added).

In the case before us, Elsie introduced evidence demonstrating the situation between Donald and Perry, their treatment of each other, and other circumstances from which the trial court ultimately concluded that Donald had become the dominant party in the parent/child relationship. Thus, the requirement that Donald demonstrate that the land transfer in question was in fact valid arose not because this was a conveyance from a parent to a child, but rather because the facts found indicated that the conveyance in question was obtained by the actual undue influence of Donald over his father.

For the reasons stated, we conclude that the trial court did not err by requiring Donald to rebut the presumption, by clear and unequivocal evidence, that the conveyance in question was fraudulent even though the transfer was one from a father to a son.

Donald incorporates into this issue two additional contentions. First, he contends there was no probative evidence to support the trial court's finding that, over the years, he had been able to overcome the will and desire of his father. Second, he contends that Elsie failed to provide the trier of fact with probative evidence of any alleged undue influence he may have exerted over his father. Donald's contentions lack merit.

As we set out above, pursuant to our standard of review, we may not reweigh the evidence and we will affirm unless the evidence, when viewed in a light most favorable to the judgment, points uncontrovertibly to an opposite conclusion. *Donovan, supra.* Such is not the case here. The facts amply support the trial court's findings, conclusions and judgment. Donald's contentions are simply invitations for us to reweigh the evidence and this we will not do.

## II.

Next, we address whether the trial court erred by not allowing into evidence, for the truth of the matters asserted therein, hearsay evidence presented by Donald and his wife, Mildred.

The record reveals that, during Mildred Crider's testimony concerning conversations she allegedly had with Perry regarding how Perry intended to dispose of his land before he died, Elsie's counsel objected on the ground of hearsay. After some discussion on the issue, the trial judge allowed Mildred's testimony to be admitted into evidence, not for the truth of the matter asserted, but rather for the fact that the statements had been made.

The record also reveals that, during Donald's testimony, Donald attempted to present the following hearsay evidence:

"Q: Now, I'm going to slip back to 1989. Did you have discussions in 1989 with your dad regarding splitting the land?

A: Yes.

Q: When?

A: Between March and May, probably.

Q: Who would, huh, start these discussions between March and May of 1989, you or your dad?

A: Dad. Dad did.... We discussed cutting the land up into different number of parcels. I wanted dad [to] go ahead and deed it to the kids, split it up. [A]nd he refused to ...

[Plaintiff's Attorney]: I'm going ... Judge, I'm trying to be careful and not object until I have to, but I really don't think that we can get into any conversations that, huh, Perry Crider may have said about the land from March of '89 through May of '89. Certainly, this witness can testify what he said .. what he said, but I think what Perry said, is going to be hearsay.

THE COURT: What do you think about that?

[DEFENDANT'S ATTORNEY]: I think this goes directly to my ability to rebutt [sic] undue influence. By statements made of the decedent regarding how he wanted to dispose of his property.

THE COURT: He's not dead. He's not dead.

[DEFENDANT'S ATTORNEY]: We've kind of acted like that....

THE COURT: I'm going to allows [sic] ... Perry Crider's statements ... in ... only [for] the fact that they were said. I'm not going to allow them in for the truth of what's being asserted. Just on what was said.

*Record* at 893–894.

Donald argues that the trial court erred by not allowing his and his wife's hearsay testimony to be admitted for the truth of the matters asserted. According to Donald, that this evidence be admitted for the truth of the matters asserted therein was crucial to his case because, with this evidence, he would have met his burden of rebutting any presumption of undue influence. We disagree.

■■■■ With certain exceptions, all persons are competent to testify. I.C. 34–1–14–4; *Stafford v. State* (1983), Ind.App., 455 N.E.2d 402. The competency of a witness is not a matter of fact, but rather a matter of law to be decided by the trial court. *Stafford, supra; Morris v. State* (1977), 172 Ind. App. 509, 360 N.E.2d 1027, 1029. Unsoundness of mind is not a *per se* disqualification of a witness. *Stafford, supra.* A person who is affected with mental illness " 'may be a competent witness depending entirely on his or her mental condition as determined by the court at the time of trial.' " *Id.,* quoting *Grecco v. State* (1960), 240 Ind. 584, 589, 166 N.E.2d 180, 182, *cert. denied,* 364 U.S. 893, 81 S.Ct. 227, 5 L.Ed.2d 191. The proponent of hearsay evidence bears the burden of demonstrating a declarant's unavailability. *See Levi v. State* (1914), 182 Ind. 188, 104 N.E. 765 ("[I]t is incumbent on the party offering such testimony to show affirmatively the existence of all facts necessary to bring the secondary evidence clearly within the exception, and, unless this is done, the evidence should be excluded."); *see also Schwartz v. State* (1978), 177 Ind.App. 258, 379 N.E.2d 480 (no abuse of discretion by excluding defendant's offer of former testimony because defendant failed to demonstrate declarant's unavailability).

■■■ As the trial court noted, Perry Crider was not dead at the time of trial; rather, he was a residential patient at a healthcare facility. Being a residential patient at a healthcare facility does not render one unavailable as a witness. While the record may contain evidence that calls into question Perry's mental competence, as we stated earlier, whether a witness is competent to testify at trial is a matter of law to be decided by the trial court. The record before us does not reveal that the trial court ever determined that Perry was incompetent, and thus unavailable, to testify at trial. Inasmuch as Donald was the proponent of the hearsay evidence at issue, and inasmuch as he failed to demonstrate Perry's unavailability, we hold that the trial court committed no error by not allowing both Donald's and his wife's hearsay testimony to be admitted for the truth of the matters asserted therein.

**Affirmed.**

SULLIVAN and NAJAM, JJ., concur.