**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 13 2012, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**PAUL J. WATTS**
Spencer, Indiana

ATTORNEY FOR APPELLEE:

**ROBERT C. PRICE**
Price & Runnells
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

NANCY J. FERGUSON and NYLA R. HAMILTON, )
)
)
Appellants, )
)
vs. )  No.  28A01-1201-PL-7
)
NATALIE A. WATKINS, )
)
Appellee. )

APPEAL FROM THE GREENE CIRCUIT COURT
The Honorable Erik C. Allen, Judge
Cause No.  28C01-0902-PL-61

**July 13, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**DARDEN, Judge**

Nancy J. Ferguson and Nyla R. Hamilton appeal the trial court's denial of their motion to set aside a deed in favor of Natalie A. Watkins.

We affirm.

## ISSUES

1. Whether the trial court erred in relying on certain evidence presented at the hearing.

2. Whether the trial court erred in concluding that the evidence established no presumption of undue influence or, in the alternative, that Natalie presented evidence sufficient to rebut a presumption of undue influence.

3. Whether an award of appellate attorney fees is warranted.

## FACTS

On May 6, 1989, Lester Eugene Watkins ("Gene") married Virginia Bennett. Gene and Virginia resided on a small Greene County farm that Gene owned at the time of the marriage. Natalie lived on the farm with Gene and Virginia until 2003, when she moved to Bloomfield, Indiana.

Gene had open heart surgery in 2003, and from that time he had trouble maintaining the farm. Virginia and Natalie helped him maintain the grounds and feed the animals. On June 3, 2004, Gene executed a will directing that his real property be distributed in equal shares to his daughters, Nancy, Nyla, Najean, and Natalie, as well as his granddaughter Laura Kay Rose.

In 2006, Gene discussed with Virginia that he wanted to deed the farm to Natalie because "Natalie didn't have a home. The other girls had homes and had places of their

2

own and families and she didn't." (Virginia's Dep. 18). However, Gene did not immediately deed the property to Natalie because it was mortgaged, and he knew that Natalie could not afford to pay off the debt.

In 2008, Gene became very ill, and he and Virginia moved to a Bloomington, Indiana house that was owned by Virginia. This move allowed Gene to begin extensive dialysis treatment. Gene was hospitalized in February 2008, and he was either hospitalized, receiving rehabilitation services, or receiving other medical treatment through a significant part of May, June, and July 2008, up to the date of his death on July 18, 2008. Natalie, while still living in Bloomfield, continued to maintain the farm grounds and feed the animals.

In May of 2008, Virginia paid off the mortgage on the farm using money she had recently inherited. This payment gave Gene the freedom to deed the farm to Natalie; indeed, in May of 2008, he told a friend, Connie Anderson, and his daughter, Najean, that he was going to deed the property to Natalie. On May 6, 2008, he told Connie that he was going to "give Natalie the farm" because "everyone else had married and moved on. Natalie was still here, she loved the place, she did the work for the place, [and] [h]e worried about her not having a home when everyone else was married and gone." (Tr. 192). On May 8, 2008, Gene told Najean that "the rest of [the] girls ha[ve] made [their] way through life, had [their] own families and home. Natalie has been close by, helped during dialysis, quit a job . . . . I want her to have a place to live." (Tr. 126). Najean, who would have received a portion of the farm under Gene's will, responded "that is fine with me." *Id*.

3

Sometime in May of 2008, Gene instructed Virginia to call his attorney and tell her to prepare a quitclaim deed. Virginia made the call, and on May 12, 2008, she picked up the deed from the attorney's office and paid for it with a check drawn on Virginia and Gene's joint account. Virginia then took the deed to the rehabilitation unit where Gene was staying while he received dialysis and treatment for various maladies.

On May 16, 2008, Gene called Natalie at the bank where she worked. He asked her to spend her lunch hour with him and to bring Nancy Orman, a family friend whom Gene trusted and Natalie's co-worker, who was also a notary public. Natalie and Orman went to the rehabilitation unit and visited with Gene for a while before Gene asked Natalie for a dollar, the amount he was charging Natalie for the property. Natalie said, "[Y]ou don't have to do this if you don't want to do this, and [Gene] said 'I wouldn't be doing this if I didn't want to do it.'" (Tr. 149, 206).

Gene signed the deed and directed Orman to notarize it. He later told several visitors to the rehabilitation center that he had deeded the farm to Natalie, including his granddaughter Laura Rose, who would have received a portion of the farm through the will.

Nancy, who had been estranged from Gene for approximately twenty years, conceded that she had expected him to deed the farm to Natalie because "Natalie always was there and I knew that she always would probably get the place for that reason." (Tr. 65). Nevertheless, Nancy confronted Natalie on May 20, 2008, and told her, "I expected dad to F me over but I did not expect you to F me over." (Tr. 67). After Gene's death,

4

Nancy confronted Virginia and told her that Gene was "a no good son of a bitch . . . and everybody knew it." (Tr. 68).

After the deed was signed, Nyla confronted Gene about whether it was fair to give the property to only one of his children. Gene remained steadfast in his conviction that he was doing the right thing.

After 82-year-old Gene died on July 18, 2008, Nancy and Nyla filed a claim to set aside the deed. Among other things, the claim asserted that Gene was "incompetent by reason of unsoundness of mind" and that he was under Natalie's undue influence at the time the deed was signed. (App. 20). The claim also asserted that the deed "was an attempt by [Natalie] to avoid [Gene's] Last Will and Testament." *Id.* (emphasis omitted).

After a bench trial, the trial court issued findings of fact and conclusions of law in support of its judgment in favor of Natalie. The trial court's findings and conclusions emphasize that Gene was of sound mind and that Natalie did not exercise undue influence over him. With reference to undue influence, the trial court concluded:

> [T]here is no presumption of undue influence in this case and the Plaintiffs maintain the burden of proof to show fraud or undue influence. The Court concludes that the Plaintiffs have failed to meet their burden of proof that the conveyance was induced by undue influence.
>
> Even if a presumption of undue influence did apply in this case, the Court would conclude that clear and convincing evidence exists to rebut such a presumption. The evidence and the findings set forth herein clearly support the conclusion that, at and around the time the deed was executed, Gene was of sound mind; he had a mind of his own and was difficult to influence; he understood the terms of and had specific plans for the transaction; and before and after the transaction was completed, he articulated his intent and plan to transfer the farm to Natalie. Gene's decision to deed the farm to Natalie was based on his own considered deliberations of what was fair and reasonable given the history and

5

relationships that existed with all his children, and was not the product of any influence exerted by Natalie or anyone else.

(App. 17-18).

### DECISION

1.  Hearsay Evidence

Nancy and Nyla contend that the trial court erred in relying on allegedly hearsay evidence that "seemed to place inappropriate emphasis on [Gene's] statements before and after signing this deed." Appellants' Br. at 13.[1] They also contend that over timely objection based on Indiana Evidence Rule 802, "the trial court admitted evidence of [Gene's] statements reflecting his knowledge that he had signed the deed."[2] *Id.* They further contend that the statements were not, pursuant to Indiana Evidence Rule 803(3), reasonably contemporaneous to the signing of the deed and, "in fact, merely show a garden variety example of cognitive dissonance."[3] *Id.* Nancy and Nyla do not point to the specific statements about which they are complaining, and they fail to cite to the page numbers in the transcript that contain the objections.

As a general rule, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Morse v. Davis*, 965 N.E.2d 148, 155 (Ind. Ct. App. 2012).

---

[1] Nancy and Nyla did not object to this evidence at trial on the basis of Indiana's Dead Man's Statute found at Indiana Code section 34-45-2-4. Furthermore, they do not raise the applicability of the statute on appeal.

[2] Evidence Rule 802 provides that hearsay "is not admissible except as provided by law or by these rules."

[3] Evidence Rule 803(3) provides that a statement is not excluded by the hearsay rule if it is a statement of the declarant's "then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it related to the execution, revocation, identification, or terms of the declarant's will."

6

An abuse of discretion occurs only if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* A party who fails to make a timely objection waives the right to have the evidence excluded at trial and the right on appeal to argue that the admission of evidence of was erroneous. *Everage v. N. Ind. Pub. Serv. Co.*, 825 N.E.2d 941, 948 (Ind. Ct. App. 2005). Such failure to object at trial waives any claim of error and allows otherwise allegedly inadmissible hearsay evidence "to be considered for substantive purposes and to establish a material fact at issue." *Miles v. State*, 777 N.E.2d 767, 771 (Ind. Ct. App. 2002). "'In failing to make a timely objection or motion, the party is, in effect, acquiescing in the admission of the evidence.'" *Everage*, 825 N.E.2d at 948 (quoting *Reed v. Dillon*, 566 N.E.2d 585, 588 (Ind. Ct. App. 1991)).

Our examination of the transcript discloses that Nancy and Nyla's trial counsel made hearsay objections to the testimony of some of Natalie's witnesses about Gene's statements but failed to object to the testimony by other witnesses about these same statements. Even if the testimony by the latter witnesses is hearsay, it may be considered for substantive purposes because Nancy and Nyla acquiesced to its admission.[4]

2.      Undue Influence

Nancy and Nyla's sufficiency argument pertaining to undue influence is two-pronged. First, they contend that the trial court erred as a matter of law in concluding that the evidence was insufficient to establish a presumption of undue influence. Second,

---

[4] Nancy and Nyla may not raise their "cognitive dissonance" argument for the first time on appeal. *See Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 892 n.3 (Ind. Ct. App. 2001).

they contend that the trial court erred in concluding that even if the presumption was warranted, Natalie presented sufficient evidence to rebut it.

As noted above, the trial court issued detailed factual findings and conclusions thereon. Indiana Trial Rule 52(A) provides that when the trial court issues such findings and a corresponding judgment, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of witnesses." Factual findings are clearly erroneous if there is no evidence or reasonable inference from the evidence to support the findings, and we review only the evidence and reasonable inferences therefrom that are favorable to the judgment without reweighing the evidence or reassessing the credibility of the witnesses. *Argonaut Ins. Co. v. Jones*, 953 N.E.2d 608, 614 (Ind. Ct. App. 2011), *trans. denied.* "We owe no deference to the trial court, however, on matters of law, reviewing these de novo." *Id*.

Undue influence is "'the exercise of sufficient control over [a] person to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised.'" *Carlson v. Warren,* 878 N.E.2d 844, 851 (Ind. Ct. App. 2007) (quoting *In re Knepper*, 856 N.E.2d 150, 154 (Ind. Ct. App. 2006), *reh'g granted on other grounds*, 861 N.E.2d 717 (Ind. Ct. App. 2007), *trans. denied*). "It may flow from the abuse of a confidential relationship in which 'confidence is reposed by one party in another with resulting superiority and influence exercised by the other.'" *Id.* (quoting *In re Neu*, 588 N.E.2d 567, 570 (Ind. Ct. App. 1992)).

We have long recognized that "a confidential relationship sufficient to allow for a successful undue influence claim may arise either as a matter of law or can be shown on the particular facts of the case." *Id.* Confidential relationships as a matter of law include the relationship between a dominant parent and a child. *Id.* This, and other confidential relationships, "'raise a presumption of trust and confidence as to the subordinate party on one side and a corresponding influence as to the dominant party on the other.'" *Id.* (quoting *Knepper*, 856 N.E.2d at 154).

Here, the trial court concluded the following with regard to the establishment of a presumption as a matter of law:

> Where one seeks to show that the child is the dominant party in the relation of parent and child, he or she must do so by showing: 1) the condition and situation of the parties; 2) their treatment of each other; and 3) other circumstances from which such ultimate fact may be inferred. In the relation of parent and child, the parent is assumed to be the dominant party. Where one seeks to show that the child is the dominant party, no inference of fraud or undue influence arises because of the mere existence of such relation, and fraud or undue influence must be clearly proved by the party asserting it. If a confidential or fiduciary relation exists in addition to the relation of parent and child, the burden is on the person obtaining the advantage to show that the transaction is perfectly fair and reasonable in every respect. Where findings indicate that the child has become the dominant party and that the child exercised actual influence over the parent, the child is properly required to rebut the presumption of undue influence by clear and unequivocal evidence.

(App. 17).

The trial court's conclusion echoes *Westphal v. Heckman*, 185 Ind. 88, 113 N.E. 299, 300 (1916), *superseded by statute on other grounds as stated in In re Estate of Banko*, 622 N.E.2d 476, 479-80 (Ind. 1993), and *Crider v. Crider*, 635 N.E.2d 204, 212-13 (Ind. Ct. App. 1994), *trans. denied.* Nancy and Nyla assert, however, that the trial

9

court's conclusion is wrong as a matter of law because the conclusion does not specifically consider Gene's "physical and mental state, his dependence on Virginia and Natalie and, most importantly, Gene's lack of participation surrounding the preparation and signing of the deed." Appellants' Br. at 10.

We disagree. The trial court's statement of the test for determining whether a presumption has been established is correct under *Westphal* and *Crider*. Furthermore, the trial court's test is broad enough to include the considerations referred to by Nancy and Nyla in their brief. More importantly, the trial court's extensive findings establish that although Natalie (1) helped Gene get to the doctor and dialysis; (2) assisted in other ways expected of the child of a sick father; and (3) helped keep the farm in order, she did not override Gene's will through a confidential and dominant relationship with him.[5]

Briefly stated, the trial court found that Gene was acting independently of Natalie when he first determined to deed the farm to her. In so finding, the trial court noted the testimony of Rusty Parkes, a friend, who stated that Gene "had a mind of his own" and "you didn't talk (Gene) into nothing." (App. 14). The trial court also noted the testimony of Gene's sister who described Gene "as being a person that would not easily be persuaded by others . . . . (and that) "this was no different when she observed Gene in May 2008." *Id*. The trial court also found that Gene announced his intentions to both disinterested and interested parties, including possible takers under his will, before and

---

[5] Virginia was not named as a party in this appeal or in the underlying suit.

after signing the deed.[6] As the trial court found, at around the time he transferred the property, Gene told Nyla that "Natalie was getting the farm 'because she didn't have anyone and the rest of you do.'" (App. 14).

The court further found that on May 16, 2008, Orman testified that Gene "required Natalie to pay him $1.00 for the farm and that Natalie had to obtain change because she had a $5 bill." (App. 15). Orman further remembered, and the court found, that Orman "recalled Natalie telling Gene that he did not have to give her the farm." *Id.*

In addition, the trial court found that Gene told Laura Kay Rose, who absent the deed would have received a portion of the farm through Gene's will, that he had transferred the farm to Natalie. The trial court specifically found that "Laura Kay opined that Gene was loving to his family but not easy to dominate . . . . and that he [transferred the farm to Natalie] because she had helped him through a lot and helped on the farm." (App. 16).

The trial court's findings were not clearly erroneous, and the court did not err as a matter of law in concluding that the evidence did not establish a presumption that Natalie had a confidential and dominant relationship with Gene that allowed her to have undue influence over him. Furthermore, the trial court cited the same evidence to support its determination that Natalie did not exercise undue influence as it did to support its conclusion that no presumption existed. Nancy and Nyla ask us to reweigh the evidence, which we will not do. As the United States Supreme Court noted in *Mackall v. Mackall*,

---

[6] There was evidence that as early as 2006, Gene discussed with Virginia his desire to deed the farm to Natalie and hesitated only because of a lien on the farm that Natalie might not be able to pay off. *See* Appellee's Br. at 2.

11

135 U.S. 167, 172 (1890), courts should not use the concept of undue influence to "deprive age and infirmity of the kindly administrations of affection or of the power of rewarding those who bestow them."

3.    Appellate Attorney Fees

Natalie requests appellate attorney fees on the basis that Nancy and Nyla's appeal "was brought in bad faith and for purposes of harassment." Natalie's Br. at 24. Under Appellate Rule 66(E), we may assess attorney fees "if an appeal . . . is frivolous or in bad faith." While ultimately unsuccessful, Nancy and Nyla's arguments were not completely void of plausibility and were reasonable challenges to the trial court's exercise of discretion. We cannot say that the arguments were either brought in bad faith or for the purposes of harassment, and we deny Natalie's request for appellate attorney fees.

CONCLUSION

Nancy and Nyla's failure to object to evidence of Gene's intentions results in waiver of the issue on appeal and acquiescence to its use as substantive evidence. Nancy and Nyla have failed to establish that the trial court erred in concluding that the evidence did not establish a presumption of undue influence or that the court erred in concluding that there was sufficient evidence to show a lack of undue influence. Though Natalie prevailed on appeal, she is not entitled to an award of appellate attorney fees.

Affirmed.

NAJAM, J., and RILEY, J., concur.